# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| PUBLIX SUPER MARKETS, INC., and PUBLIX SUPER MARKETS INC. GROUP HEALTH BENEFIT PLAN<br><br>*Plaintiffs,*<br><br>v.<br><br>ABA CARES OF FLORIDA LLC, d/b/a ABA CENTERS OF FLORIDA and ABA CENTERS OF GEORGIA LLC<br><br>*Defendants.* | **Civil Action No. 8:25-cv-02283 KKM-AEP**<br><br>**AMENDED COMPLAINT**<br><br>**EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF REQUESTED**<br><br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

Plaintiffs Publix Super Markets, Inc. and Publix Super Markets, Inc. Group Health Benefit Plan, for their Amended Complaint against ABA Cares of Florida LLC d/b/a ABA Centers of Florida, LLC and ABA Centers of Georgia LLC, allege as follows:

## NATURE OF ACTION

1.     This case arises from a healthcare fraud scheme orchestrated by Defendants ABA Cares of Florida LLC d/b/a ABA Centers of Florida, LLC ("ABA Centers of Florida") and ABA Centers of Georgia LLC ("ABA Centers of Georgia") (together, the "ABA Centers" or "Defendants"). Plaintiffs are Publix Super Markets, Inc. ("Publix"), an employer which self-insures the benefits at issue in this case, and the Publix Super Markets, Inc. Group Health Benefit Plan (the "Plan") that Publix sponsors and

administers. The Plan and Publix may be referred to herein as "Plaintiffs." Publix associates covered by the Plan are referred to herein as "Members."[1] Members and their dependents who are covered by the Plan are referred to herein as "Plan Participants." The Plan is established and operated as an employee welfare benefit plan under the Employee Retirement Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.*

2.      The Plan relies on third party administrator Blue Cross Blue Shield of Florida ("BCBS") to receive and process claims and billing information from health care providers and Plan Members, and to transmit payments for covered services to health care providers and to Plan Members according to the terms and conditions of the Plan.

3.      The ABA Centers have defrauded Publix and the Plan out of millions of dollars through the submission of fraudulent medical billing information which Plaintiffs and BCBS relied upon to make payment decisions associated with health care services purportedly provided by the ABA Centers to Plan Participants in the States of Florida and Georgia.

4.      The ABA Centers are for-profit entities that purport to provide Applied Behavior Analysis therapy services to individuals with autism spectrum disorder. ABA Centers of Florida made fraudulent submissions to Plaintiffs for services relating to beneficiaries (i.e., children with autism spectrum disorder) of twelve (12) Members (two (2) of whom each has two (2) beneficiaries) since 2022. ABA Centers of Georgia made

---

[1] Publix employees are referred to as associates.

fraudulent submissions to Plaintiffs for services relating to one (1) Member's beneficiary since 2024.

5.      Upon information and belief, each of the ABA Centers controls all material aspects of its behavioral therapy businesses, including claims submissions and billings.

6.      Both ABA Centers of Florida and ABA Centers of Georgia are part of a larger association-in-fact that includes numerous members and affiliates of Defendants, and which describes itself as a vertically integrated behavioral healthcare organization. It boasts of disrupting the industry through a "tech-centric modus operandi" and operates across at least nine states – including Georgia and this forum state, Florida.

7.      The ABA Centers employ a common scheme that involves the submission of fraudulent, deceptive and improper information to Plaintiffs and BCBS, knowing they will rely on that information to Plaintiffs' detriment and to make payment determinations that inure to the benefit of ABA Centers.  From 2022 to present, this scheme encompasses many millions of dollars in improper submissions resulting in millions of dollars of overpayments that ultimately inured to the benefit of the ABA Centers, which were related to just the thirteen (13) Plan Members, and fifteen (15) Plan Participants, identified in paragraph 4 above.

8.      Plaintiffs and BCBS have identified and denied more than $6.89 million of improper ABA Centers' submissions since November 2022, before they were paid: $6.1 million from ABA Centers of Florida and $755,600 from ABA Centers of Georgia. Based on BCBS's reporting to Plaintiffs, many of those submissions were fraudulent

because they were:  (i) requests for payments that duplicate previous payments; (ii) submissions for services that ABA Centers could not establish ever occurred; (iii) submissions for services that ABA Centers knew were not covered per the terms of the Plan; (iv) submissions with inaccurate CPT codes[2] and incorrect places of service; (v) submissions for services that were out-of-scope for Defendants to provide; and (v) submissions for services that were not medically necessary, even though the medical necessity of those services was a prerequisite for coverage and payment under the Plan. These submissions were also false and fraudulent for the separate reason that they resulted from the out-of-network provider circumvention scheme described below, and accordingly Plaintiffs are not obligated to pay for them.

9.     Plaintiffs have identified another $15.05 million in false and fraudulent submissions made by ABA Centers from October 2024 to present: $14.02 million by ABA Centers of Florida and $1.03 million by ABA Centers of Georgia.  They were false and fraudulent when made because they result from the same ABA Centers' out-of-network provider circumvention scheme described below, and Plaintiffs are not obligated to pay for them.

10.     In addition to the submissions described in the preceding two paragraphs, Plaintiffs have identified $9.94 million in additional false, fraudulent, deceptive and improper submissions by the ABA Centers from 2022 and up through October 2024

---

[2] CPT codes are a common, uniform health care service classification system which allow health care providers and payers to use a short numeric code to describe a discrete, billable health care service.

($9.62 million by ABA Centers of Florida and $317,935 from ABA Centers of Georgia).

These submissions induced Plaintiffs to make payments totaling at least $5.8 million[3] --

before ABA Centers' fraudulent billing scheme was detected.  Of that total, $5.66 million

was paid in reliance on submissions by ABA Centers of Florida and $182,761 was paid

in reliance on submissions by ABA Centers of Georgia.

11.     As described more fully herein, ABA Centers' knowing, intentional and

fraudulent scheme is specifically designed to circumvent the Plan's structure and

deliberately interferes with the Plan's terms and conditions, as well as its contractual

relationship with its Plan Members, all to the ill-gotten benefit of ABA Centers.

12.     With respect to the services at issue in this case, the Plan uses a common

health care plan structure referred to as a preferred provider organization (or PPO). This

means the Plan's terms and conditions vary depending upon whether a Plan Member receives

services from an "in network" health care service provider or from an "out-of-network" health

care service provider.

13.     "In-network" providers enter into network participation agreements pursuant

to which they contractually agree to comply with Plan terms and conditions and to discount

the price of their services to Plan Members. They also agree not to balance bill Plan Members

for the amount of the agreed upon price discount – meaning they are prohibited from asking

---

[3] The Plan and BCBS calculate Plan and Plan Member payment responsibilities for covered services on the basis of the "allowed amount" relying on the accuracy of submissions from out of network providers such as the ABA Centers. The allowed amount is calculated to be equal to 60% of ABA Centers' billed charge. If, as happened here, ABA Centers misrepresents its billed charge for the services provided, the misrepresentation will cause the Plan to pay the wrong amount (here, overpayments due to ABA Centers inaccurately reporting a grossly inflated billed charge rather than its true, actual billed charge).

the Plan Member to pay (or otherwise collecting) the difference between the provider's regular retail (i.e, "sticker") price and the discounted price they agree to accept via their network participation agreement. In exchange, in-network providers benefit (a) from Plan terms and conditions that incentivize the use of in-network providers and disincentivize the use of out-of-network providers, (b) from being able to receive payment directly from the Plan (which out-of-network providers cannot do), and (c) from being listed in provider directories made available to Plan Members.

14.    While Plan terms and conditions permit Plan Members to choose to receive covered health care services from an "out-of-network" provider, there are disadvantages to doing so. For example, the Plan Member must pay the out-of-network health care provider directly and then submit to the Plan requests to be reimbursed for the Plan's share of the cost for the out-of-network provider's services.  In addition, the Plan Member is responsible for the out-of-network provider's full billed charge for the services received. Finally, the Plan Member is subject to greater cost-sharing obligations for out-of-network services (meaning higher deductibles and copays/coinsurance than they would pay if the services were received in network), and must pay those amounts in order for the Plan to have any responsibility for the out-of-network provider's services.[4]

15.    For the relevant time period (since 2022), the Plan's terms and conditions applicable to out-of-network services provided by the ABA Centers to Plan Members or their

---

[4] Co-insurance is calculated as a percentage of the total amount allowed by the Plan for a covered service; by contrast co-payments typically are calculated as a flat dollar figure per service.  Relevant for the services and time period at issue here, under the terms and conditions of the Plan a Plan Member's co-insurance is 40% of the allowed amount, with the Plan's share equal to the remaining 60%.  For example, if the Plan allowed amount for a covered out-of-network service is $100, the Plan Member is responsible for the out-of-network provider's full retail ("sticker") price and may seek and receive reimbursement of $60 from the Plan.

beneficiaries calculates the Plan's liability to Plan Members based upon ABA Centers reported billed charge (i.e., retail or "sticker" price).[5] If the ABA Centers misrepresent (i.e., overstate or inflate) their billed charge in submissions to the Plan or its administrator, BCBS, the Plan, in reliance on that reported retail price, will be misled into paying the wrong amount, and an amount different from (and higher than) its actual liability to the Plan Member under the terms of the Plan. Unfortunately, this is exactly what has been happening here to the tune of millions of dollars in overpayments.

16.    Each of the ABA Centers is an out-of-network provider under the Plan. As such, when it reports its billed charge in submissions to the Plan, it does so knowing it has no right to receive payment directly from the Plan, that the Plan will not make payment directly to the ABA Centers, and that the Plan will only make payment directly to the Plan Member. The ABA Centers also know, expect and intend that the Plan will calculate the Plan's and Member's responsibility for the cost of ABA Centers' services by relying on the ABA Centers' reported billed charge and the understanding that the ABA Centers will collect their full billed charge from the Plan Member.

17.    Understanding the basic structure of PPO plans, each of the ABA Centers employs the same simple scheme to defeat the Plan's terms and realign the economic

---

[5] In health care billing and reimbursement parlance, and as a matter of industry practice, the term "usual and customary billed charge" is often used to describe a health care provider's retail price – which is the technical term used across the industry to refer to the price a provider routinely charges and collects from cash paying patients, including patients receiving health care services on an out-of-network basis. Health care providers know, expect and intend, that insurers and health plans, like the Plan, will rely on the health care provider's reported retail price/billed charge when determining their coverage obligation under the terms of the insurance contract or health plan. Throughout this Complaint, we use the terms "retail price" and "billed charge" interchangeably to refer to the price the ABA Centers are required to report, and purport to include, in their billing submissions to the Plan and BCBS.

incentives so that it is more advantageous for Plan Members to receive services on an out-of-network basis from the ABA Centers than receiving those same services in network. That is, each of the ABA Centers simply chooses not to collect any amount of money from the Plan Member beyond what the Plan pays, or otherwise collects only a *de minimis* amount in comparison to the amount of money a Plan Member is responsible for under the terms of the Plan – whether it be deductible, co-insurance, or any portion of the billed charge that the Plan does not pay.  In this way, the ABA Centers make Plan Members indifferent to the price, including increases in price, for ABA Centers' services, and the full cost of their services is ultimately borne entirely by the Plan.

18.     Said differently, each of the ABA Centers effectively accepts the amount the Plan reimburses the Plan Member (and the Plan Member pays over to the ABA Centers) as payment in full for the services provided by the ABA Centers, and in no way seeks to collect any meaningful amount from the Plan Member over and above those Plan payments, thereby foregoing entirely (or virtually entirely) collection of the Member's deductibles, copay/coinsurance, and the difference between the amount of the Plan payment and ABA Centers' reported billed charge which is the basis upon which the Plan payment is calculated.

19.     Perpetrating this out-of-network provider circumvention scheme necessarily requires the ABA Centers to engage in a common form of health care fraud. Specifically, each of the ABA Centers do not collect, and has no intention of ever collecting, its purported billed charge for services rendered to Plan Members. Because they never intend to collect that amount, it is a myth, a sham and a ruse and, in any

8

event, not an accurate reflection of its true, actual billed charge which must be reported consistent with the industry standard "usual and customary billed charge." Yet, an intentionally inflated, inaccurate and misleading billed charge is exactly what each of the ABA Centers includes in submissions to the Plan's administrator (BCBS) expecting, knowing, and intending that BCBS and the Plan will rely on that misrepresented amount to apply the terms of the Plan and determine the amount the Plan will pay (or in this case overpay) for services provided on an out-of-network basis by the ABA Centers.

20.    An example using the billing information for services provided by ABA Centers of Florida to a single Plan Participant (Member 1) illustrates the consequences flowing from ABA Centers of Florida's out-of-network provider circumvention scheme and its submission of fraudulently inflated billed charges.  Chart 1 below shows what the Plan (mistakenly) records and pays when it is fraudulently led to believe the billed charge is true and accurate and applies the Plan's terms and conditions to determine the Plan's and Member's respective financial responsibilities; Chart 2 illustrates some of the harm to the Plan resulting from ABA Centers of Florida's fraudulent conduct:

Chart 1 – What the Plan records and pays when it is fraudulently led to believe

the billed charge is true and accurate and applies the Plan's terms and conditions:

| Service[6] Date | ABA CTR Billed Charge | Plan Allowed Amount [60% of Billed Charge] | Member Coinsurance Payment Recorded by Plan [40% of Allowed Amount up to Annual OOP Max] | Member Annual Out-of-Network Deductible Payment Recorded by Plan | Plan Payment to Member [60% of Allowed Amount; 100% after OOP Max] | Check # for Payment Sent to Member | Non-Allowed Amount Paid by Member [40% of Billed Charge] |
|---|---|---|---|---|---|---|---|
| 2/20/2023 | $5,160.00 | $3,096.00 | $838.40 | $1,000.00 | $1,257.60 | 0001293683 | $2,064.00 |
| 2/22/2023 | $8,600.00 | $5,160.00 | $2,064.00 | $0.00 | $3,096.00 | 0001293912 | $3,440.00 |
| 3/1/2023 | $2,565.00 | $1,539.00 | $615.60 | $0.00 | $923.40 | 0001296612 | $1,026.00 |
| 2/28/2023 | $3,705.00 | $2,223.00 | $889.20 | $0.00 | $1,333.80 | 0001302142 | $1,482.00 |
| 3/14/2023 | $4,510.00 | $2,706.00 | $1,082.40 | $0.00 | $1,623.60 | 0001302142 | $1,804.00 |
| 5/17/2023 | $3,705.00 | $2,223.00 | $510.40 | $0.00 | $1,712.60 | 0001302840 | $1,482.00 |
| 5/20/2023 | $4,845.00 | $2,907.00 | $0.00 | $0.00 | $2,907.00 | 0001303029 | $1,938.00 |
| 5/18/2023 | $2,565.00 | $1,539.00 | $0.00 | $0.00 | $1,539.00 | 0001302840 | $1,026.00 |
| 5/18/2023 | $3,705.00 | $2,223.00 | $0.00 | $0.00 | $2,223.00 | 0001302840 | $1,482.00 |
| 5/19/2023 | $3,705.00 | $2,223.00 | $0.00 | $0.00 | $2,223.00 | 0001302840 | $1,482.00 |
| 5/19/2023 | $2,850.00 | $1,710.00 | $0.00 | $0.00 | $1,710.00 | 0001338347 | $1,140.00 |

---

[6] This is only a small number of service dates for which ABA Centers of Florida submitted fraudulent billing information for services purportedly provided to Plan Participant/Member 1 during calendar year 2023. For Plan Participant/Member 1, there are more than 180 individual line items for services purportedly rendered to Member 1 during the 2023 calendar (and Plan coverage) year, with billed charges submitted to the Plan totaling more than $800,000 for which the Member has indicated ABA Centers of Florida has never collected even one dollar of deductible, coinsurance or non-allowed amount from the Member.

Chart 2 – Illustrating some of the harm resulting from ABA Centers of Florida's fraudulent conduct:

| Service Date | ABA CTR Billed Charge | Plan Allowed Amount [60% of Billed Charge] | Member Coinsurance Payment In Fact | Member Annual Out-of-Network Deductible Payment In Fact | Plan Payment to Member of Allowed Amount up to $7,000 Annual OOP Max; 100% of Allowed Amount Thereafter | Check # for Payment Sent to Member | Non-Allowed Amount Paid by Member In Fact |
|---|---|---|---|---|---|---|---|
| 2/20/2023 | $5,160.00 | $3,096.00 | $0.00 | $0.00 | $1,257.60 | 0001293683 | $0.00 |
| 2/22/2023 | $8,600.00 | $5,160.00 | $0.00 | $0.00 | $3,096.00 | 0001293912 | $0.00 |
| 3/1/2023 | $2,565.00 | $1,539.00 | $0.00 | $0.00 | $923.40 | 0001296612 | $0.00 |
| 2/28/2023 | $3,705.00 | $2,223.00 | $0.00 | $0.00 | $1,333.80 | 0001302142 | $0.00 |
| 3/14/2023 | $4,510.00 | $2,706.00 | $0.00 | $0.00 | $1,623.60 | 0001302142 | $0.00 |
| 5/17/2023 | $3,705.00 | $2,223.00 | $0.00 | $0.00 | $1,712.60 | 0001302840 | $0.00 |
| 5/20/2023 | $4,845.00 | $2,907.00 | $0.00 | $0.00 | $2,907.00 | 0001303029 | $0.00 |
| 5/18/2023 | $2,565.00 | $1,539.00 | $0.00 | $0.00 | $1,539.00 | 0001302840 | $0.00 |
| 5/18/2023 | $3,705.00 | $2,223.00 | $0.00 | $0.00 | $2,223.00 | 0001302840 | $0.00 |
| 5/19/2023 | $3,705.00 | $2,223.00 | $0.00 | $0.00 | $2,223.00 | 0001302840 | $0.00 |
| 5/19/2023 | $2,850.00 | $1,710.00 | $0.00 | $0.00 | $1,710.00 | 0001338347 | $0.00 |

21.     Lines 1 of Chart 1 and 2 show ABA Centers of Florida fraudulently reporting an inflated billed charge of $5,160 for services rendered on 2/20/2023 knowing, expecting and intending that the Plan will rely on that amount when applying the Plan's terms and conditions to determine the Plan's financial responsibility to the Member, and the Member's financial responsibilities for the applicable deductible, coinsurance, and the non-allowed amount (i.e., that portion of the billed charge which exceeds the Plan Allowed Amount). The billed charge is inflated and fraudulent because

ABA Centers of Florida in fact has no intention, and does not, collect any amount from the Member for services provided to Member 1 despite the billed charge submission conveying the opposite. Instead, ABA Centers of Florida accepts as payment in full only that amount paid by the Plan to the Member that the Member thereafter pays over to ABA Centers of Florida.

22. Not knowing ABA Centers of Florida has fraudulently inflated its billed charge to reflect amounts it has no intention of ever collecting for services rendered on 2/20/2023, the Plan updates the Member's account status to reflect that the Member has (i) exhausted the 2023 annual deductible for the applicable Plan Participant (i.e., patient-child of the Member) because ABA Centers of Florida purports to have collected the first $1,000 of the Allowed Amount, and (ii) made a coinsurance payment of $550.40. It likewise understands and relies on ABA Centers' representation (pursuant to its reported billed charge) that it has collected the non-allowed portion of the billed charge from the Member (i.e., that amount of the billed charge which exceeds the Plan Allowed Amount). Accordingly, in reliance on ABA Center's fraudulent submission, the Plan records the 2023 annual individual deductible for Plan Participant/Member 1 has been fully satisfied, and credits both the purported $1,000 deductible payment and $550.40 coinsurance payment towards the Member's $7,000 Annual Out-of-Pocket Maximum for 2023. Because ABA Centers does not intend to, and makes no effort to, collect any payment from the Member, the Member's deductible in fact remains wholly unsatisfied and no amount of the Member's Out-of-Pocket Maximum has in fact been eroded because ABA Centers of Florida has not collected the Member's deductible or

coinsurance payments. This practice continues for services rendered through the line item associated with the 5/17/2023 service date.  As of the time ABA Centers of Florida submits fraudulent billing information, including its fraudulently inflated billing charge, for those services, the Plan, in reliance on ABA Centers of Florida's fraudulently submitted billed charges for services rendered from 2/20/2023 to 5/17/2023 is led to believe the Member has in fact paid out-of-pocket the $1,000 deductible amount, and each of the coinsurance payments listed in Chart 1 associated with the services rendered from 2/23/2023 to 5/17/2023, which total $6,000. Thus, the Plan has been fraudulently led to believe the Plan Member has made payments totaling $7,000, exhausting the Member's $7,000 Annual Out-of-Pocket Maximum for out-of-network services. Accordingly, from that point forward, Chart 1 shows the Plan paying 100% of the Allowed Amount associated with the services provided by ABA Centers, even though ABA Centers of Florida has never collected, and never intends to collect, the Member's deductible or coinsurance payments, leaving the Member's Out-of-Pocket Maximum both unsatisfied and wholly untouched.  The Plan also continues to calculate financial responsibility on the basis of its understanding, relying on ABA Centers of Florida's fraudulently submitted billed charge, that ABA Centers of Florida is collecting from the Member the non-allowed amount of ABA Centers of Florida's billed charge, a critical mechanism used by the Plan to avoid the very harm that has occurred here – fraudulent and abusive billing practices by an unchecked, out-of-network provider.

23.    The same scheme is shown with respect to Plan Participant/Member 2 who received services provided by ABA Centers of Georgia. The first chart below shows

13

what the Plan (mistakenly) records and pays when it is fraudulently led to believe the billed charge is true and accurate when applying the Plan's terms and conditions to determine the Plan's and Member's respective payment responsibilities; the second chart illustrates the harm to the Plan due to ABA Centers of Georgia's fraudulent conduct:

Chart 1 – What the Plan records when it is fraudulently led to believe the billed charge is true and accurate when applying the Plan's terms and conditions:

| Service[7] Date | ABA CTR Billed Charge | Plan Allowed Amount [60% of Billed Charge] | Member Coinsurance Payment Recorded by Plan [40% of Allowed Amount up to Annual OOP Max] | Member Annual Out-of-Network Deductible Payment Recorded by Plan | Plan Payment to Member [60% of Allowed Amount up to $8,000 OOP Max; 100% of Allowed Amount Thereafter] | Check # for Payment Sent to Member | Non-Allowed Amount Paid by Member [40% of Billed Charge] |
|---|---|---|---|---|---|---|---|
| 5/17/2024 | $3,960.00 | $2,376.00 | $550.40 | $1,000.00 | $825.60 | 0001348833 | $1,584.00 |
| 5/22/2024 | $3,800.00 | $2,280.00 | $912.00 | $0.00 | $1,368.00 | 0001350509 | $1,520.00 |
| 5/22/2024 | $2,640.00 | $1,584.00 | $633.60 | $0.00 | $950.40 | 0001350509 | $1,056.00 |
| 5/22/2024 | $1,350.00 | $810.00 | $324.00 | $0.00 | $486.00 | 0001350509 | $540.00 |
| 5/23/2024 | $3,960.00 | $2,376.00 | $950.40 | $0.00 | $1,425.60 | 0001348833 | $1,584.00 |
| 5/24/2024 | $2,640.00 | $1,584.00 | $633.60 | $0.00 | $950.40 | 0001348833 | $1,056.00 |
| 6/5/2024 | $3,300.00 | $1,980.00 | $792.00 | $0.00 | $1,188.00 | 0001350509 | $1,320.00 |
| 6/5/2024 | $1,800.00 | $1,080.00 | $432.00 | $0.00 | $648.00 | 0001350509 | $720.00 |
| 6/5/2024 | $2,375.00 | $1,425.00 | $570.00 | $0.00 | $855.00 | 0001350509 | $950.00 |
| 6/6/2024 | $3,800.00 | $2,280.00 | $912.00 | $0.00 | $1,368.00 | 0001349526 | $1,520.00 |
| 6/8/2024 | $4,620.00 | $2,772.00 | $290.00 | $0.00 | $2,482.00 | 0001349886 | $1,848.00 |
| 6/12/2024 | $9,240.00 | $5,544.00 | $0.00 | $0.00 | $5,544.00 | 0001352801 | $3,696.00 |
| 6/12/2024 | $6,650.00 | $3,990.00 | $0.00 | $0.00 | $3,990.00 | 0001352801 | $2,660.00 |
| 6/13/2024 | $9,240.00 | $5,544.00 | $0.00 | $0.00 | $5,544.00 | 0001351227 | $3,696.00 |
| 6/14/2024 | $4,620.00 | $2,772.00 | $0.00 | $0.00 | $2,772.00 | 0001351227 | $1,848.00 |

---

[7] This is only a small number of service dates for which ABA Centers of Georgia submitted fraudulent billing information for services purportedly provided to Plan Participant Member 2 during calendar year 2024. For Plan Participant Member 2, there are more than 117 individual line items for services purportedly rendered to Member 2 during the 2024 calendar (and Plan coverage) year, with billed charges submitted to the Plan totaling more than $580,900 for which the Member has indicated ABA Centers of Georgia collected, at most, at the rate of $100 per month to cover any and all of the Member's out-of-pocket financial responsibility for applicable deductibles, coinsurance and non-allowed amounts associated with services provided by ABA Centers of Georgia, and without regard to number of or billed charges for those services in any given month.

14

| 6/15/2024 | $4,620.00 | $2,772.00 | $0.00 | $0.00 | $2,772.00 | 0001350843 | $1,848.00 |
| 6/17/2024 | $9,900.00 | $5,940.00 | $0.00 | $0.00 | $5,940.00 | 0001351227 | $3,960.00 |

Chart 2 – How ABA Centers of Georgia's fraudulent conduct harms the Plan:

| Service Date | ABA CTR Billed Charge | Plan Allowed Amount [60% of Billed Charge] | Member Coinsurance Payment In Fact | Member Annual Deductible Payment in Fact | Plan Payment to Member [60% of Allowed Amount up to $8,000 OOP Max; 100% of Allowed Amount Thereafter] | Check # for Payment Sent to Member | Non-Allowed Amount Paid by Member [40% of Billed Charge] |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 5/17/2024 | $3,960.00 | $2,376.00 | $0.00 | $100.00 | $825.60 | 0001348833 | $0.00 |
| 5/22/2024 | $3,800.00 | $2,280.00 | $0.00 | $0.00 | $1,368.00 | 0001350509 | $0.00 |
| 5/22/2024 | $2,640.00 | $1,584.00 | $0.00 | $0.00 | $950.40 | 0001350509 | $0.00 |
| 5/22/2024 | $1,350.00 | $810.00 | $0.00 | $0.00 | $486.00 | 0001350509 | $0.00 |
| 5/23/2024 | $3,960.00 | $2,376.00 | $0.00 | $0.00 | $1,425.60 | 0001348833 | $0.00 |
| 5/24/2024 | $2,640.00 | $1,584.00 | $0.00 | $0.00 | $950.40 | 0001348833 | $0.00 |
| 6/5/2024 | $3,300.00 | $1,980.00 | $0.00 | $100.00 | $1,188.00 | 0001350509 | $0.00 |
| 6/5/2024 | $1,800.00 | $1,080.00 | $0.00 | $0.00 | $648.00 | 0001350509 | $0.00 |
| 6/5/2024 | $2,375.00 | $1,425.00 | $0.00 | $0.00 | $855.00 | 0001350509 | $0.00 |
| 6/6/2024 | $3,800.00 | $2,280.00 | $0.00 | $0.00 | $1,368.00 | 0001349526 | $0.00 |
| 6/8/2024 | $4,620.00 | $2,772.00 | $0.00 | $0.00 | $2,482.00 | 0001349886 | $0.00 |
| 6/12/2024 | $9,240.00 | $5,544.00 | $0.00 | $0.00 | $5,544.00 | 0001352801 | $0.00 |
| 6/12/2024 | $6,650.00 | $3,990.00 | $0.00 | $0.00 | $3,990.00 | 0001352801 | $0.00 |
| 6/13/2024 | $9,240.00 | $5,544.00 | $0.00 | $0.00 | $5,544.00 | 0001351227 | $0.00 |
| 6/14/2024 | $4,620.00 | $2,772.00 | $0.00 | $0.00 | $2,772.00 | 0001351227 | $0.00 |
| 6/15/2024 | $4,620.00 | $2,772.00 | $0.00 | $0.00 | $2,772.00 | 0001350843 | $0.00 |
| 6/17/2024 | $9,900.00 | $5,940.00 | $0.00 | $0.00 | $5,940.00 | 0001351227 | $0.00 |

24.    Lines 1 of Chart 1 and 2 show ABA Centers of Georgia fraudulently reporting an inflated billed charge of $3,960 for services rendered on 5/17/2024 knowing, expecting and intending that the Plan will rely on that amount when applying the Plan's terms and conditions to determine the Plan's and Member's payment responsibilities. The billed charge is inflated and fraudulent because ABA Centers of Georgia has no intention, and does not, collect the required amounts from the Member for services provided to Member 2 More specifically, as the Chart 2 shows, the amounts

sought and collected by ABA Centers of Georgia for the months of May and June, 2024 total to $200, while its fraudulent billing information, including its misrepresented billed charge, convey it has collected a $1,000 deductible, $7,000 in coinsurance, and more than $31,000 in non-allowed billed charges. In other words, ABA Centers of Georgia represents it has collected almost $40,000 when, in fact, it has collected only a fraction (0.5%) of that amount. The fact that ABA Centers of Georgia may collect some *de minimis* amount from the Member (e.g., $100 a month, which is nowhere reflected or revealed in the billed information submitted to the Plan and bears no relationship to the Members' obligation under the Plan) does not make the ABA Centers' fraud any less harmful or actionable.  In such circumstances, the ABA Centers are still fraudulently inflating the billed charge to reflect amounts that they know they have no intention of ever collecting.  The Plan is misled into recording that the Member has (i) exhausted their annual deductible – a prerequisite that must be satisfied before the Plan has any financial responsibility to the Member, (ii) made a much greater co-insurance payment for each visit to ABA Centers – when in fact no amount of coinsurance has been or will be collected, and (iii) satisfied the annual Out-of-Pocket Maximum of $8,000 for out-of-network services – triggering the Plan's responsibility to pay (overpay) for 100% of the Plan Allowed Amount associated with ABA Centers of Georgia's services to Member 2 (rather than 60% of the Plan Allowed Amount the Plan would pay if it new in fact ABA Centers of Georgia had collected less than the $8,000 necessary to satisfy that Out-of-Pocket Maximum).

16

25.     By remaining out-of-network providers, the ABA Centers avoid entering into a network participation agreement, freeing them from having to accept a set discounted price for services provided to Plan Members. At the same time, by charging Plan members nothing or only a *de minimis* amount for the services they provided, the ABA Centers defeat the Plan's cost-sharing mechanisms designed to prevent unchecked, out-of-control, fraudulent and abusive pricing practices perpetrated by out-of-network providers. Having completed those two steps, the ABA Centers then know and exploit the fact that the higher the billed charge they report in submissions to BCBS and the Plan, the more the Plan will pay for those services. Which brings us to the egregious consequences flowing from the ABA Centers fraudulent conduct.

26.     ABA Centers was recently ranked No. 1 in the Southeast on a list of fast-growing private companies in 2024 and boasted revenue growth of 32,000% over 3 years. That astronomical growth was only achievable through the fraudulent and deceptive billing scheme central to ABA Centers' racketeering enterprise.

27.     Each of the ABA Centers billing submissions reflect grossly excessive billed charges for their purported services.  ABA Centers' billing submissions reflect, on average, a rate of $500 for 15 minutes for CPT codes where the agreed-upon payment to in-network providers averages only $13 for that same 15 minute period.  These exorbitant charges exceed $1000 for a 15 minute increment for CPT code 97151—over $4,000 an hour—where the agreed-upon payment for in network providers averages $21.90, or $88

17

an hour.[8]  Each of ABA Centers' billed charges to Publix and the Plan were many multiples of the customary amount accepted by in-network providers—in some cases 50 times or more of that amount. This is made possible only because the ABA Centers' fraudulent scheme (as described above) insulates Members from what are, by any measure, its egregious prices because they forego collection of the Member's financial responsibility under the Plan.  Worse yet, Members also have reported that ABA Centers of Florida padded bills with charges for time not worked.

28.    A year's worth of autism services at each of the ABA Centers' rates can amount to a million dollars or more in fraudulently misrepresented billed charges.  Based on the billed charges it submits to the Plan, ABA Centers misrepresents that it collects from Plan Members the Member's deductible and coinsurance, up to the Plan Participant's applicable Out-of-Pocket Maximum ($8,000 per individual/$16,000 per family for out-of-network services for 2024), and the difference between the Plan Allowed Amount and the billed charge for every service even after the deductible and Out-of-Pocket Maximum are satisfied.[9]  The math is striking:  if ABA does what it is supposed to do, Plan Members would have to pay hundreds of thousands (or, in the case

---

[8] Publix's in-network rates are in line, for example, with  the maximum reimbursement rates for Florida Medicaid.  For CPT Code 97151, Florida Medicaid's maximum reimbursement fee is $19.05 per 15-minute increment (far less than the $1000 for 15 minute charge from ABA Centers).

[9] For clarity, there are two distinct "40%" factors applicable to  out-of-network services under the Plan:  (i) the co-insurance that the Member must pay, which is calculated as 40% of the Plan allowed amount for a service; and (ii) the entire non-allowed amount, which equals 40% of the provider's billed charge (a/k/a the difference between the provider's submitted billed charge and the allowed amount approved by the Plan).  Both are Members' responsibility, but the ABA Centers intentionally collect neither to ensure its scheme to defraud the Plan proceeds uninterrupted by disgruntled patients forced to bear financial responsibility for a portion of its egregious prices, as they are required to do under the terms of the Plan.

of one Member with two beneficiaries, more than $1.1 million) each year for services provided by ABA Cares at their grossly inflated and misrepresented billed charges.

29.     As an out-of-network provider, the billed charges ABA Centers submits to the Plan can only be truthful and not fraudulently inflated if ABA Centers intends to, and collects, from Members the applicable deductible and coinsurance, and the difference between their billed charge and the Plan allowed amount for each service. Because ABA Centers has no intention to collect, and in fact did not collect, these amounts from Plan Members (except, perhaps, in some cases a *de minimis* amount which affects neither the actionability, nature or magnitude of the fraud), all of the billed charges ABA Centers submitted to Plaintiffs are rendered false and fraudulent.  Plaintiffs are not obligated to pay for fraudulent claims under the terms of the Plan.

30.     ABA Centers' fraudulent scheme has cascading effects that actively undermine the Plan's design and cost structure, which otherwise are intended to incentivize Members to use much more affordable in-network services or the most cost efficient out-of-network options.  As a result of ABA's actions, Plan Members are incentivized to obtain grossly more costly services from ABA Centers because they are actually *cheaper* to Members (or free), as opposed to *in-network* services that might require an out-of-pocket co-payment or other deductible amount.

31.     By design, ABA Centers is carrying out a fraudulent scheme to line its own pockets with large enough fraudulently-induced payments made by Plaintiffs to make collection of the other amounts owed by Members out of their own pockets (i.e., not reimbursed by the Plan) unnecessary.  ABA Centers' fraudulent out-of-network

circumvention scheme thereby gouges the Plan, takes advantage of families with children with autism, and causes Plaintiffs to overpay for excessively-priced services.  It is a quintessential case of healthcare fraud.

32.     At least seven (7) Members of the Plan have reported that ABA Centers can and will make fraudulent submissions to payers such as Publix and the Plan for treatment purportedly provided in conjunction with activities that do not constitute proper treatment and medically necessary services, including, by way of example, going to the movies, amusements parks and other recreational activities outside of school and the home.  That is thousands of dollars an hour to take a Plan Participant to the movies, a trampoline park or the like.  ABA Centers knows that these non-medically necessary services are not covered under the Plan but has submitted claims for them anyway in an attempt to induce Plaintiffs to pay them.

33.     This coordinated scheme involved claims submitted to Plaintiffs in 2022 through 2024 and, upon information belief, continues to the present day. Plaintiffs' claims are subject to equitable tolling and the discovery rule due to Defendants' fraud.

34.     As a result of Defendants' fraud, and as amplified by their decision to remain out-of-network providers, Plaintiffs paid significantly more for certain claims associated with out-of-network Applied Behavior Analysis therapy services provided by ABA Centers than Plaintiffs were legally obligated to do.

35.     Plaintiffs' investigation has revealed that ABA Centers' fraud is almost certainly not limited to Publix, the Publix Plan, and its Members; indeed, the healthcare fraud scheme described herein is at the heart of the ABA Centers' business

model.  Individuals who represent themselves to be former employees of the ABA Centers and parents of patients have posted on Reddit, the social news aggregation and social media platform, about the ABA Centers' charging excessive rates and its practice of "forcing" employees to "unethically" overbill.  As one individual representing themself to be a former ABA Centers employee stated, the ABA Centers are "one of the most unethical businesses I've ever encountered in the wild." Indeed, former employees of the ABA Centers have stated that:  "The typical rate per hour for BCBA [a board-certified behavior analyst] and therapist is between [$]80-130.  [The ABA Centers] would charge $300-1200 an hour."

36.     The postings include those by individuals who represent they are former employees of the ABA Centers, indicating that the ABA Centers "bill crazily high rates to the insurance (definitely > 10x by a wide margin compared to other providers), *and get the patient onboard with this practice by not asking patients for co-insurance payment."* (Emphasis added.)

37.     In addition to charging "crazily high rates" and engaging in fee forgiveness practices, individuals representing they are former employees of the ABA Centers have posted that the ABA Centers also unethically overbill for time with patients.  As one stated:  "Over billing is not only encouraged, but sometimes even required."  Another posted that the Director of Operations in Orlando (located in this District) advised employees "to tack 15 minutes onto [each] session, even when therapeutic interventions aren't being performed."  The individual admitted this tactic was "billing fraud."

38.     Furthermore, other individuals indicating they are former employees of the ABA Centers have posted that the ABA Centers "over approve the number of client hours" because "most sessions are at least 5 hours and there is not 5 hours of programming to run."  As an example of the ABA Centers over approving hours, the poster recalled "working with a client for a month who ha[d] no goals or programming in the system, so essentially they are billing insurance companies for ABA therapies that are not being provided."  Still other individuals indicating they are former employees of the ABA Centers posted that the ABA Centers "ask families to bring [Behavioral Technicians] to any activity even if the [Behavioral Technician] cannot participate and simply just observe on the side (e.g., during other non-ABA therapy sessions), so that they can bill insurance with crazy hours on top of their crazy rates per hour."

39.     Individuals indicating they are parents of patients have also posted about the ABA Centers' fraudulent billing on Reddit.  One such individual posted:  The ABA Centers fraudulently "charged our insurance company [but not the member][10] almost a million dollars.  They are quick to diagnosis and get you in.  They prey on families.  Their billing is insane[;] they charged for holidays and days no one even came to our house."

40.     One (1) of Plaintiffs' Members (Member 2) reported a similar experience with ABA Centers of Georgia:  a BCBA would come to the house, place a toy in front

---

[10] Just as with Plaintiffs' Members.

22

of their son, use the restroom and then leave without doing any work, stating they had to get to their next client. This was a regular routine for this BCBA.

41.     This lawsuit is not about ethically administered ABA therapy as a form of treatment for children properly diagnosed with autism. What is in dispute here are ABA Centers' fraudulent billing practices.

42.     Through this lawsuit, Plaintiffs seek: (i) damages from Defendants' acts, including treble damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d); (ii) appropriate equitable, declaratory and injunctive relief under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.; (iii) attorneys' fees and costs; and (iv) any other relief requested herein or that the Court deems just and proper.

## THE PARTIES

43.     Plaintiff Publix Super Markets, Inc. is a Florida corporation with its principal place of business in Lakeland, Florida.

44.     Publix is the Plan Sponsor and Plan Administrator of Plaintiff Publix Super Markets Inc. Group Health Benefit Plan, under which Publix pays the majority of the total cost for health care coverage for its employees. The Plan offers a self-insured PPO benefit option and a fully-insured HMO benefit option. All of the benefits and claims at issue in this lawsuit arise under the self-insured PPO benefit option.

45.     Blue Cross Blue Shield of Florida is the third-party claims administrator for the self-insured PPO benefit portion of the Plan.

23

46.     Defendant ABA Cares of Florida LLC d/b/a ABA Centers of Florida, LLC is a Florida limited liability company with its principal place of business in Fort Lauderdale, FL and an address of 110 East Broward Blvd., Suite 1100, Fort Lauderdale, FL 33301.  It also reports having locations in Boca Raton, Jensen Beach, Orlando, Tampa and Celebration, Florida.

47.     Defendant ABA Centers of Georgia, LLC is a Delaware limited liability company with its principal place of business in Fort Lauderdale, FL and an address of 110 East Broward Blvd., Suite 1100, Fort Lauderdale, FL 33301.  It also reports having locations in Atlanta and Alpharetta, Georgia.

48.     Upon information and belief, both Defendants share one or more common managers, including Agile Enterprises LLC ("Agile").  Among the members of Agile is Christopher Barnett, who is the founder and Chairman of ABA Centers' ultimate parent company.

## JURISDICTION AND VENUE

49.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it arises under federal laws. Specifically, Plaintiffs assert claims under RICO, 18 U.S.C. § 1962(c) and (d), and ERISA, 29 U.S.C. § 1001, *et seq*. In particular, Plaintiffs' claim under ERISA section 502(a)(3) is subject to exclusive jurisdiction in federal court.  This Court also has subject-matter jurisdiction over Publix's state and common law claims under 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case or controversy.

24

50.     This Court has general and specific jurisdiction over ABA Centers of Florida and ABA Centers of Georgia, both of whom have their principal place of business in Florida, and systematically and continuously conduct business in Florida and impact Florida citizens, including the acts that give rise to this lawsuit.

51.     Venue is proper in this District under 28 U.S.C. § 1391 because the ABA Centers of America and the ABA Centers of Florida are present and do substantial business in this District—two of the four ABA Centers of Florida locations listed on its website are located in the Middle District of Florida—and five of the Publix Plan Members in connection with whom ABA Centers of Florida made fraudulent submissions reside within and received services within the District.   In sum, a substantial part of the events giving rise to the claims in this action occurred in this District.

## THE IMPACTED HEALTH BENEFIT PLAN

52.     Publix is a large employee-owned supermarket chain, located mainly in the southeastern United States, which operates its own Group Health Benefit Plan, thereby paying the majority of the total cost for health care coverage for its employees under this Plan.

53.     Through the billing scheme described herein, Defendants submitted fraudulent and deceptive information to the Plan and Publix, which is the self-insured sponsor and administrator of the segment of the Plan (the PPO benefit) at issue.

54.     Publix and the Plan undertake financial responsibility for these services pursuant to the written terms of the Plan, which identifies the rights and obligations of

the Plan and Plan Members. Plaintiffs use the services of a third party claims administrator, which processes Publix associates' healthcare claims and pays those claims from Plan funds contributed by Publix and its associates.

55.    The Plan functions in accordance with the terms of the contracts and/or plan documents, which establish, among other things, the rights and responsibilities of the payor (Publix/Plan), any claims administrator, and of the Plan Members who have enrolled in the Plan (i.e., Publix associates and their covered dependents/beneficiaries).

56.    Under the Plan, Members are allowed to self-direct their health care and choose whether to use in-network providers to receive the highest level of benefits available under the Plan. Services received from out-of-network providers are designed and intended to be paid at a lower level of insurance benefits, which is designed to encourage Members to utilize in-network options because use of in-network options is more efficient and cost-effective, inuring to the benefit of all Plan Participants. Conversely, because Publix and the Plan Members' financial contributions to the Plan reflect the Plan's medical expense experience, when the Plan is forced to overpay for out-of-network services rendered by the ABA Centers, it negatively impacts all Plan Participants.

57.    When a Member chooses, or is induced to seek, services from an out-of-network provider, the economics are very different for the Member.

58.    Out-of-network providers, such as the ABA Centers, are asked to submit, and do submit, billing information to the Plan and BCBS to support Plan Member's

26

requests for reimbursement of the Plan's share of costs associated with the out-of-network provider's services. Like health care providers industry-wide, ABA Centers knows the billing information it submits must be accurate and truthful, including amounts it submits as its purported billed charge for the services provided to Plan Members. It knows, expects and intends that the Plan will rely on those submissions as truthful representations when applying the terms and conditions of the Plan to determine the financial payment responsibility of the Plan and Plan Members for ABA Centers' services. It further knows and expects the Plan to conclude that it is collecting applicable deductibles, coinsurance and non-allowed costs from Plan Members, even when ABA Centers knows it has misrepresented it is doing so because, in fact, it has no intent of seeking, and does not seek, payment of any of those amounts from Plan Members.  For example, failure to collect the deductible, alone, means the prerequisite that must be satisfied before the Plan has any financial responsibility for out-of-network services provided by the ABA Centers has in fact not been satisfied.

## ABA CENTERS' FRAUDULENT OUT-OF-NETWORK PROVIDER CIRCUMVENTION SCHEME

59.    The ABA Centers claim and hold themselves to be a "best in class" business with experience in Autism Spectrum Disorder ("ASD") and applied behavior analysis.[11]   While holding themselves out as having the mission to "guide families through the process, providing the tools and support needed to improve the quality of

---

[11] https://www.abacenters.com/best-in-business-list-in-health-services/#:~:text=ABA%20Centers%20is%20a%20vertically,at%20www.abacenters.com.

life for children with autism and their families," in reality ABA Centers is a money-making scheme built on churning out false and fraudulent claims and price gouging insurers, such as Plaintiffs, through ABA Centers' fraudulent scheme.

60.    As described above, Publix and the Plan have determined that, from 2022 and up through the fall of 2024 when Plaintiffs held submissions to fully investigate ABA Centers' billings, there were approximately $9.94 million dollars in grossly inflated and fraudulent submissions procured by virtue of ABA Centers' out-of-network provider circumvention scheme. Of that amount, $9.62 million was related to submissions by ABA Centers of Florida and $317,935 was from submissions of ABA Centers of Georgia. These submissions induced Plaintiffs to make payments for the benefit of ABA Centers totaling at least $5.8 million before the out-of-network circumvention scheme was detected.  Of that total, $5.66 million was paid in reliance on submissions by ABA Centers of Florida and $182,761 was paid in reliance on submissions by ABA Centers of Georgia.

61.    In addition, Plaintiffs have identified another $15.05 million in false and fraudulent submissions made by ABA Centers from October 2024 to present; $14.02 million by ABA Centers of Florida and $1.03 million by ABA Centers of Georgia.  They were false and fraudulent when made because they result from the ABA Centers' out-of-network provider circumvention scheme described herein, and Plaintiffs are not obligated to pay for them.[12]

---

[12]  These amounts are in addition to the more than $6.89 million of improper ABA Centers submissions since November 2022 that were denied before they were paid; $6.1 million from ABA Centers of Florida

62.    Finally, Plaintiffs believe that ABA Centers are continuing to submit fraudulent claims and, if unchecked, will continue to submit fraudulent claims in the future.

63.    When the Plan's out-of-network providers, including ABA Centers here, make submissions to induce payment by Plaintiffs in connection with those services, they represent that those services are covered and that the elements and conditions of coverage have been satisfied.

64.    ABA Centers know whether the individuals to which they provide services are Plan Participants.  They also know whether the Plan Participant has deductible, co-insurance or other cost-share obligations for out-of-network services as a condition of coverage.

65.    The submissions by ABA Centers, all of which involve instances where ABA Centers know that the Plan Participant has not paid its full financial obligations for out-of-network services, are intentionally deceptive.

66.    For example, Plaintiffs' investigation has revealed that, with respect to the nine (9) Plan Participants seen by ABA Centers of Florida between January 1, 2024 and October 1, 2024, based on ABA Centers of Florida's billed charges, the Members' respective financial obligations for those services was between $207,996 and $664,424

---

and $755,600 from ABA Centers of Georgia.  In addition to the other reasons why these submissions were improper, they also were  false and fraudulent for the separate reason that they  resulted from the out-of-network provider circumvention scheme described below, and accordingly Plaintiffs were not obligated to pay for them.

*per Member*.   The total financial obligation of these Members for just those ten (10) months, based on submissions of ABA Centers of Florida to Plaintiffs and BCBS, was nearly $3.4 million.

67.   With respect to the one (1) Plan Participant (Member 2) seen by ABA Centers of Georgia between January 1, 2024 and October 1, 2024, based on ABA Centers of Georgia's billed charges, the Member's financial obligations for those services was $214,422.

68.   Based on Plaintiffs' investigation, ABA Centers did not collect or even try to collect these amounts, or the other financial obligations applicable to services in 2022, 2023, and since October 2024.   Instead, ABA Centers assured Plaintiffs' Members that they would not be responsible for these costs and ABA Centers would make it up in billings to the Plan.

69.   More specifically, Plaintiffs' investigation has revealed that ABA Centers of Florida never sought to collect *any* deductible, co-insurance, or other portion of the billed charge (other than what Publix Paid) from at least two (2) Members (Member 1 and Member 3).   One (1) (Member 1) was explicitly told by ABA Centers, "[You] will never have to pay anything out of pocket" for our services.   That Member's financial obligations, based on ABA Centers of Florida's billed charges submitted to the Plan for services in 2023 and up through October of 2024, was in excess of $1.85 million.

70.   Another Member (Member 4) reported that they were given "an option" by ABA Centers of Florida as to what amount to pay.   That Member reported to Plaintiffs that someone from ABA Centers told them that "the only thing [ABA Centers]

would charge him is a monthly payment" and "they would handle [the rest] with [their] insurance."  ABA Centers then asked them how much the Member could pay in the "$100 to $300" range and the Member "went with $100 a month."  There was no effort to collect any other portion of the Member's financial obligation under the terms of the Plan.  Over the course of the ten (10) months in 2024 reviewed in detail by Plaintiffs, that Member's total financial obligations for that period alone was in excess of $300,000.

71.     Another Member (Member 5) reported that ABA Centers of Florida asked what the Member wanted to pay for services.  The Member paid $50 per month.  There was no effort to collect any other portion of the Member's financial obligation under the terms of the Plan. Over the course of the ten (10) months in 2024 reviewed in detail by Plaintiffs, that Member's total financial obligations for that period alone would have been in excess of $290,000.

72.     Another Member (Member 6) reported that she also only paid ABA Centers of Florida $100 a month.  There was no effort to collect any other portion of the Member's financial obligation under the terms of the Plan. Over the course of the ten (10) months in 2024 reviewed in detail by Plaintiffs, that Member's total financial obligations for that period alone would have been in excess of $580,000.

73.     Although another Member (Member 7) also offered to pay $50 per month, ABA Centers of Florida suggested that the Member instead consider paying even less— telling the Member that others were purportedly only paying $10 per month.  When the Member probed how ABA Centers would get paid with such little monthly contributions from the member, ABA Centers of Florida assured the Member that ABA Centers would

31

get money from the Plan by being "out of network." There was no effort to collect any other portion of the Member's financial obligation under the terms of the Plan. That Member's total financial obligations for 2023 alone were in excess of $230,000.

74.     Another Member (Member 2) who received services from Defendant ABA Centers of Georgia, reported that they only had to pay $100 per month. There was no effort to collect any other portion of the Member's financial obligation under the terms of the Plan. Over the course of the ten (10) months of 2024 reviewed in detail by Plaintiffs, that Member's total financial obligations for that period alone were in excess of $200,000.

## FRAUDULENT OVERBILLING PRACTICES OF ABA CENTERS

75.     Given the incentives to Members resulting from ABA Centers's fraudulent out-of-network provider circumvention scheme, it is not surprising that the Plan has seen a steady rise in the number of submissions from ABA Centers of Florida and Georgia, causing increasingly greater financial burden to Plaintiffs. Because ABA Centers' scheme also benefits from submitting as large a billed charge as possible, ABA Centers has "doubled down" on its fraud by engaging in improper overbilling and billing inflation which increases those fraudulent amounts.

76.     For example, ABA Centers bills on average $500 for 15 minutes for CPT codes where the network average is $13 for 15 minutes. These exorbitant charges go as high as $1,237.50 for a 15-minute increment—nearly $5,000 an hour—where the network average for that CPT code is $21.90, or $88 an hour.

77.     With respect to Plaintiffs' Members, for example, on February 22, 2023, Member 1 was charged $1,075 for every 15 minutes of service under CPT code 97151, totaling $8,600 for a two-hour session.  Similarly, on April 12, 2024, Member 8 was charged $1051.88 for every 15 minutes of service under CPT code 97151, totaling $8,415 for a two-hour session.  Even more notably, on March 10, 2024, May 30, 2024, and June 8, 2024, Members 3, 9, and 5, respectively, were charged $1,237.50 for every 15 minutes of service under CPT code 97151 for a total of $9,900 each two-hour session.  Again, based on a review of ABA Centers' submissions, from 2022 through 2024, ABA Centers never charged less than $430 per 15 minute increment for CPT code 97151 for these five (5) Members, compared to the in-network average of $21.90 for the same services.

78.     Various Plan Members lodged complaints relating to double billing and excessive billing noting that the very large sums of money being delivered to them via check, intending to be passed along to the ABA Centers for reimbursement, alerted them to the fact that the ABA Centers were billing for duplicate or excessive amounts when compared to the services offered to their autistic children.

79.     In one instance, one (1) Member (Member 1), who has two (2) children receiving services from ABA Centers of Florida, reported that it seemed to be billing twice on the same claims.  The same Member also noted that they were getting billed "ridiculous amounts of money" for clinical psychiatric and outpatient psychiatric services when neither of that Member's children received such services; the children typically received services at school for 5.5 hours and at home for 1.5 hours.  Claims data for the Member show that ABA Centers was billing for services at school, home, and at

33

an "office" location.  Notably, the claims attributed to an "office" for this Member's location in 2023 and 2024 totaled over $1.1 million dollars for two (2) children the Member reported never received ABA services in any office.

80.    A Plan Member (Member 1) also reported that, even though the nature and quantum of the services rendered to their child had not changed, ABA Center's billed charges increased significantly.   For example, in February 2023, ABA Centers charged $410 for every 15 minutes of "Supervision" services under CPT code 97155.  By February 2024, they were charging $475 for the same 15 minutes of supervision.  Similarly, during that same time frame, ABA Centers went from charging $285 for 15 minutes of "RBT Therapy" services under CPT code 97153, to $330.  And again, they went from charging $390 for 15 minutes of "Family Treatment" services under CPT code 97156, to $450. These increases came without any material change to the services provided to the Plan Member's child and without the self-policing mechanisms that would mitigate such increases if the Member actually had to absorb and pay for their share of those cost increases themselves.

81.    In another instance, a Plan Member (Member 6) noted that a BCBA was supposed to show up once a week to observe the therapy being done by the registered behavior technicians ("RBT") and to discuss the treatment plan for the following week. However, the BCBA began showing up to the Member's home three (3) times a week and charging for it—necessitating the Plan Member to request that the BCBA stop such unnecessary visits.  Those additional unauthorized visits had the impact of increasing the standard RBT Therapy bill—already $330 for a 15-minute increment—by an additional

$145 dollars per 15 minute increments to now cover the $475 for a 15 minute increment that visits by a BCBA were billed at. Another Member (Member 7) confirmed this practice—reporting that the Member's own BCBA quit working for ABA Centers upon seeing the amount in checks that the Member was receiving and upon realizing that ABA Centers was billing for more hours than the BCBA was providing.

82. Further, it was reported to the claims administrator that ABA Centers technicians were accompanying Plan Members and their children on vacations/recreational trips—including to amusement parks, the movies, and birthday parties—which were being coded as "other." An ABA Centers representative informed one Plan Member (Member 6) that the ABA Centers pays for the therapist's tickets for those trips – but ABA Centers submitted charges for the therapist's time. The Plan, however, specifically excludes coverage for custodial care and personal comfort services.

83. Nonetheless, the ABA Centers submitted such claims for reimbursement, against Plan terms, and coded them so the claims administrator, without further diligence, would not see that it was an excluded service. As one Member (Member 7) put it, ABA Centers are "complete thieves" who "take advantage of kids with autism" and who are committing "fraud."[13]

---

[13] As noted in paragraph 8 above, Plaintiffs have identified and denied more than $6.89 million of improper ABA Centers' submissions since November 2022, before they were paid. The circumstances described in paragraph 76 to 84 both corroborate the fact that ABA Centers was submitting fraudulent claims and, unfortunately, indicate that other fraudulent billing practices are being used to try to skirt detection by Plaintiffs and BCBS.

## THE FRAUDULENT CLAIMS SUBMITTED BY ABA CENTERS

84.     The spreadsheet attached as Exhibit A-1 hereto sets forth the known fraudulent, deceptive and improper submissions by ABA Centers of Florida to Plaintiffs and their agents and already paid by Plaintiffs.  Exhibit A-1 includes specific details of the fraudulent claims, including the dates these claims were submitted; identifiers of the Plan Member with respect to whom the claims were submitted; the person or entity that submitted the claims; the codes submitted for the claims; and the amounts submitted for those claims.  Plaintiffs seek damages and appropriate equitable relief with respect to these amounts.

85.     The spreadsheet attached as Exhibit A-2 hereto sets forth the known fraudulent, deceptive and improper submissions by ABA Centers of Georgia to Plaintiffs and their agents and already paid by Plaintiffs.  Exhibit A-2 includes specific details of the fraudulent claims, including the dates these claims were submitted; identifiers of the Plan Member with respect to whom the claims were submitted; the person or entity that submitted the claims; the codes submitted for the claims; and the amounts submitted for those claims.  Plaintiffs seek damages and appropriate equitable relief with respect to these amounts.

86.     The spreadsheet attached as Exhibit B-1 hereto sets forth the known fraudulent, deceptive and improper submissions claims submitted by ABA Centers of Florida to Plaintiffs and its agents for which payment has been sought by ABA Centers, but which has not been paid.  Plaintiffs seek appropriate equitable and declaratory

relief, including an Order that they are not obligated to pay for these or future fraudulent claims from ABA Centers of Florida.

87.     The spreadsheet attached as Exhibit B-2 hereto sets forth the known fraudulent, deceptive and improper submissions claims submitted by ABA Centers of Georgia to Plaintiffs and its agents for which payment has been sought by ABA Centers, but which has not been paid.  Plaintiffs seek appropriate equitable and declaratory relief, including an Order that they are not obligated to pay for these or future fraudulent claims from ABA Centers of Florida.[14]

## CAUSES OF ACTION AGAINST ALL DEFENDANTS

## COUNT ONE BY BOTH PLAINTIFFS
## VIOLATION OF RICO, 18 U.S.C. § 1962(c)

88.     Plaintiffs incorporate by reference as fully set forth herein the factual allegations set forth above in paragraphs 1 through 87, each of which is applicable to the cause of action set forth in this Count One.

## The RICO Enterprise

89.     The ABA Centers are part of an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  Defendants ABA Centers of Florida and ABA Centers of Georgia, as well as their non-defendant related corporate affiliates and shared LLC managers and members that ostensibly provide services for

---

[14] Each of the Exhibits anonymizes the Plan Members by referring to them as Numbers to protect their personal identifying health information (PHI), and Plaintiffs have done the same when referring to the Members in this pleading.  Where there are two Plan Participants associated with Member 1 and Member 10, Plaintiffs use (A) and (B) to differentiate between Plan Participants.  Plaintiffs are able to cross-walk each Member with their numerical identifier.

individuals with autism spectrum disorder and make submissions to the Plan in order to induce a payment for the benefit of Defendants, are associated-in-fact for the common purpose of carrying on an ongoing unlawful Enterprise.

90.     Since at least 2022 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and have conducted a RICO pattern involving false and fraudulent submissions to Plaintiffs and BCBS or their claims administrator in connection with services provided to Plan Participants.

91.     Among the common relationships of the Enterprise are, for example, Kristy M. Johnson, who is listed as the "Registered Agent" and "Chief Legal Officer" of ABA Centers of Florida on filings with the Florida Division of Corporations. Likewise, Kristy M. Johnson is listed as the "Authorizer" and "Attorney In Fact" for Centers of Georgia LLC with the Georgia Secretary of State Corporations Division. Ms. Johnson is also identified as an authorizer and attorney in fact for other non-defendant affiliates of ABA Centers, including ABA Centers of America LLC. Additionally, members of the Enterprise, including both Defendants, share one or more common managers, including Agile Enterprises LLC ("Agile"). Among the members of Agile is Christopher Barnett, who is the founder and Chairman of ABA Centers' ultimate parent company.

92.     Moreover, the principal address listed on the Florida Division of Corporations for ABA Centers of Florida is 110 East Broward Blvd., Suite # 1100, Fort Lauderdale, FL 33301. ABA Centers of Georgia has also used 110 East Broward Blvd.,

Suite # 1100, Fort Lauderdale, FL 33301 as its principal office address with the Georgia Secretary of State Corporations Division.

93.     In sum, despite the differing legal entities (ABA Centers have related affiliates that provide similar services in other states, such as ABA Centers of America, LLC in Massachusetts), the Enterprise shares a common desire and goal of effectuating the pattern of racketeering activities described herein – indeed it is essential to the Enterprise's business model.

### The Pattern of Racketeering Activity

94.     The racketeering acts set forth herein were carried out over a multi-year period, were related and similar, and were committed as part of ABA Centers' knowing and intentional scheme to defraud Plaintiffs.

95.     As described herein, this pattern of racketeering activity poses a specific threat of repetition, extending indefinitely into the future, inasmuch as the Enterprise, through ABA Centers of Florida and ABA Centers of Georgia, continue to the present day to provide false and fraudulent submissions to Plaintiffs and their claims administrator in an effort to wrongfully induce additional payments from Plaintiffs for the benefit of ABA Centers.

96.     By virtue of its activities, ABA Centers engaged in a continuous series of predicate acts of mail fraud and wire fraud.  ABA Centers acted with intent to engage in the predicate acts and with actual knowledge that ABA Centers' conduct was illegal. As described herein, ABA Centers knowingly and intentionally engaged in a fraudulent out-of-network provider circumvention scheme.

39

97.     The Enterprise, via ABA Centers, acted with the specific intent to defraud Publix and divert Plan funds.

98.     The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. § 1343 and "fraud by mail" within the meaning of 18 U.S.C. § 1341, both of which are "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitute a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

99.     As a part of the pattern of racketeering activity, and for the purpose of executing the out-of-network provider circumvention scheme described herein, ABA Centers made false and fraudulent submissions, in the form of electronic billed charges in violation of 18 U.S.C. § 1343 in an effort to induce payment from Plaintiffs for healthcare services ABA Centers allegedly provided to the Plan Participants.

100.     With respect to amounts which Defendants induced Plaintiffs to pay, the LCharge column of Exhibit A-1 hereto reflects the fraudulent electronic submission of billed charges by ABA Centers of Florida in furtherance of the Enterprise's racketeering activity.  Similarly, the LCharge column of Exhibit A-2 hereto reflects the fraudulent electronic submissions of billed charges by ABA Centers of Georgia in furtherance of the Enterprise's racketeering activity which induced payments by Plaintiffs.

101.     With respect to amounts which Defendants sought to induce Plaintiffs to pay through their false and fraudulent submissions, but which have not been paid, the LCharge column of Exhibit B-1 hereto reflects the fraudulent electronic submissions

40

of billed charges by ABA Centers of Florida in furtherance of the Enterprise's racketeering activity. Similarly, the LCharge column of Exhibit B-2 hereto reflects the fraudulent electronic submissions of ABA Centers of Georgia in furtherance of the Enterprise's racketeering activity.

102.   As a part of the pattern of racketeering activity, and for the purpose of executing the out-of-network provider circumvention scheme described herein, ABA Centers' scheme caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were payments on Plaintiffs' behalf sent from South Carolina by the Plan's administrator, BCBS, and induced by the knowingly false and fraudulent billed charge submissions by ABA Centers described herein.

103.   The LPAY column of Exhibit A-1 hereto reflects the fraudulently-induced payments that ABA Centers of Florida caused to be issued from Plaintiffs' claims administrator in South Carolina via interstate commerce, using the United States Postal Service, in furtherance of the Enterprise's racketeering activity.   The LPAY column of Exhibit A-2 hereto reflects the fraudulently-induced payments that ABA Centers of Georgia  caused to be issued from Plaintiffs' claims administrator in South Carolina via interstate commerce, using the United States Postal Service, in furtherance of the Enterprise's racketeering activity.

104.   ABA Centers' submission of fraudulent claims and bills, and Plaintiffs' induced payments, affect interstate commerce because they involve, among other things, transmissions across state lines, including between and among Florida and

Georgia, where Plaintiffs Members received ABA Services, and South Carolina, from which Plaintiffs' payments were sent.  In addition, other members of the Enterprise, such as ABA Centers of America, LLC, operate in other states, including Massachusetts.  Upon information and belief, given the highly formalized and inter-related corporate, management and ownership intersections among the members of the association-in-fact, Plaintiffs are certain that members of the Enterprise further engaged in communications and activities among themselves and across state lines for purposes of effectuating their pattern of racketeering activity.

105.   The fraudulent billed charges submissions and induced payments described above constitute part of a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

106.   The pattern of racketeering activity is distinct from the RICO Enterprise. The Enterprise, which includes the association-in-fact of related corporate affiliates, managers, and members of ABA Centers, engages in the fraudulent billing practices that comprise the pattern of racketeering activity to further their for-profit business model and to cause payors such as Plaintiffs to make Plan payments which they otherwise would not be obligated to pay.

### Damages

107.   By reason of ABA Centers' violation of 18 U.S.C. § 1962(c), Publix and the Plan have been injured in their business or property, and damaged in the aggregate amount of at least $5.8 million, the exact amount to be determined at trial.  The injuries

suffered by Publix and the Plan occurred in the United States and is domestic, not foreign.

108.    As a direct and proximate result of the false and fraudulent submissions sent by the Enterprise to Plaintiffs and their claims administrator, Publix and the Plan were defrauded and incurred damages that well-exceeded the amount that would be otherwise due and owing.  Among other things, ABA Centers engaged in a continuous pattern of mail and wire fraud by engaging in the out-of-network provider circumvention scheme described herein.  Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from ABA Centers treble damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## COUNT TWO BY BOTH PLAINTIFFS
## RICO CONSPIRACY UNDER 18 U.S.C. § 1962(d)

109.    Plaintiffs incorporate by reference as fully set forth herein the factual allegations set forth above in paragraphs 1 through 87, each of which is applicable to the cause of action set forth in this Count Two.

110.    Plaintiffs also incorporate by reference as fully set forth herein the factual allegations set forth above in paragraphs 89 through 108 regarding Defendants' violation of the RICO statute, each of which is also applicable to the related cause of action set forth in this Count Two regarding Defendants' violation of a different subsection of the RICO statute.

111.    The ABA Centers have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

112.    By and through each of the Defendant's business relationships with one another, their close coordination with one another in the affairs of the Enterprise, the frequent false and fraudulent billed charges submissions described above, and the induced payments by Plaintiffs' claims administrator as a result thereof (also described above), each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.   Moreover, through the same connections and coordination, each Defendant knew that the other Defendant was engaged in a conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1962(c).

113.    Each Defendant agreed to and acted with intent to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to defraud Publix and divert Plan funds, in violation of 18 U.S.C. § 1962(c).   In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the out-of-network provider circumvention scheme.   Additionally, each Defendant acted with actual knowledge that the conduct of the Enterprise was illegal, and each Defendant acted with the specific intent to defraud Publix and divert Plan funds.

114.   Each Defendant knowingly agreed to and acted with intent to facilitate, engage, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit mail and wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

115.   The participation and agreement of each Defendant was necessary to allow the commission of this out-of-network provider circumvention scheme. Indeed, if only one of the Defendants had engaged in the scheme, and not the other, Defendants likely would not have been able to conceal it from Plaintiffs and BCBS.

116.   Publix and the Plan have been and will continue to be injured in their business and property by reason of the Defendants' scheme in violation of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

117.   The injuries to Publix and the Plan that directly, proximately, and reasonably foreseeably result from these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars lost by Publix and the Plan due to Defendants' fraudulent racketeering activity.

118.   Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and pursuing claims based on Defendants' fraudulent racketeering activity.

119.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

## COUNT THREE BY BOTH PLAINTIFFS
### FRAUD/FRAUDULENT BILLING PRACTICES

120.   Plaintiffs incorporate by reference as fully set forth herein the factual allegations set forth above in paragraphs 1 through 87, each of which is applicable to the cause of action set forth in this Count Three.

121.   As described above, each submission of billed charges by ABA Centers constitutes a certification and representation that the information shown, including the amount included, is true, accurate, and complete, and that the submitted billing information does not knowingly or recklessly disregard or misrepresent or conceal material facts.

122.   Each of the ABA Centers is an out-of-network provider under the Plan.  As such, when it reports its billed charge in submissions to the Plan, it does so knowing it has no right to receive payment directly from the Plan, that the Plan will not make payment directly to the ABA Centers, and that the Plan will only make payment directly to the Plan Member. The ABA Centers also know, expect and intend that the Plan will calculate the Plan's and Member's responsibility for the cost of ABA Centers' services by relying on the ABA Centers' reported billed charge and the understanding that the ABA Centers will collect their full billed charge from the Plan Member.

123.   Yet , each of the ABA Centers do not collect, and has no intention of ever collecting, its purported billed charge for services rendered to Plan Members. Because they never intend to collect that amount, it is a myth, a sham and a ruse and, in any event, not an accurate reflection of its true, actual billed charge which

46

must be reported consistent with the industry standard "usual and customary billed charge."

124.    An intentionally inflated, inaccurate and misleading billed charge is exactly what each of the ABA Centers includes in submissions to the Plan's administrator expecting, knowing, and intending that BCBS and the Plan will rely on that misrepresented amount to apply the terms of the Plan and determine the amount the Plan will pay (or in this case overpay) for services provided on an out-of-network basis by the ABA Centers.

125.    ABA Centers made these misrepresentations in connection with each of the submissions described herein, and the misrepresentations were material to Plaintiffs' determination of whether the Plan has any liability for the service.

126.    The ABA Centers made their misrepresentations with the intent to wrongfully induce Plaintiffs to make payments.  The ABA Centers know, expect and intend that the Plan will calculate the Plan's and Member's responsibility for the cost of ABA Centers' services by relying on the ABA Centers' reported billed charge and the understanding the ABA Centers will collect their full billed charge from the Plan Member.

127.    Plaintiffs reasonably relied on these misrepresentations by the ABA Centers in connection with the payments it made on Exhibit A-1 and Exhibit A-2. Because Plaintiff's claims administrator processes an overwhelmingly high volume of claims per day, the vast majority are adjudicated electronically, trusting that the information submitted by ABA Centers was accurate.

47

128.    Thus, Plaintiffs relied on the ABA Centers' representations that the information submitted, namely the billed charge, was true, accurate, and complete, and did not knowingly or recklessly disregard, misrepresent, or conceal material facts.

129.    Because of their reliance on these misrepresentations, and the omissions that Defendants knowingly made, Publix and the Plan were damaged.

130.    Thus, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

## COUNT FOUR BY BOTH PLAINTIFFS
## NEGLIGENT MISREPRESENTATION AND OMISSION

131.    Plaintiffs incorporate by reference as fully set forth herein the factual allegations set forth in paragraphs 1 through 87, each of which is applicable to the cause of action set forth in this Count Four.

132.    This cause of action is pleaded in the alternative to Count Three.

133.    As described above, each submission of billed charges by ABA Centers constitutes a certification and representation that the information shown, including the amount included, is true, accurate, and complete, and that the submitted billing information does not, among other things, negligently disregard or misrepresent or conceal material facts.

134.    Each of the ABA Centers is an out-of-network provider under the Plan. As such, when it reports its billed charge in submissions to the Plan, it does so knowing it has no right to receive payment directly from the Plan, that the Plan will not make payment directly to the ABA Centers, and that the Plan will only make payment directly

to the Plan Member. The ABA Centers also know, expect and intend that the Plan will calculate the Plan's and Member's responsibility for the cost of ABA Centers' services by relying on the ABA Centers' reported billed charge and the understanding that the ABA Centers will collect their full billed charge from the Plan Member.

135.    Yet , each of the ABA Centers do not collect, and has no intention of ever collecting, its purported billed charge for services rendered to Plan Members. Because they never intend to collect that amount, it is not an accurate reflection of its true, actual billed charge which must be reported consistent with the industry standard "usual and customary billed charge."

136.    An intentionally inflated, inaccurate and misleading billed charge is exactly what each of the ABA Centers includes in submissions to the Plan's administrator expecting, knowing, and intending that BCBS and the Plan will rely on that misrepresented amount to apply the terms of the Plan and determine the amount the Plan will pay (or in this case overpay) for services provided on an out-of-network basis by the ABA Centers.

137.    ABA Centers made these misrepresentations in connection with each of the submissions described herein, and the misrepresentations were material to Plaintiffs' determination of whether the Plan has any liability for the service and where the Plan determines it has such liability, to Plaintiffs' determination of the amount of that liability.

138.    The ABA Centers made their misrepresentations negligently, at least, with the intent to wrongfully induce Plaintiffs to make payments.  The ABA Centers

know, expect and intend that the Plan will calculate the Plan's and Member's responsibility for the cost of ABA Centers' services by relying on the ABA Centers' reported billed charge and the understanding the ABA Centers will collect their full billed charge from the Plan Member including any deductible and/or coinsurance liability the Plan Member is responsible for under the terms and conditions of the Plan.

139.   Plaintiffs reasonably relied on these misrepresentations by the ABA Centers in connection with the payments it made on Exhibit A-1 and Exhibit A-2. Because Plaintiff's claims administrator processes an overwhelmingly high volume of claims per day, the vast majority are adjudicated electronically, trusting that the information submitted by ABA Centers was accurate.

140.   Thus, Plaintiffs relied on the ABA Centers' representations that the information submitted, namely the billed charge, was true, accurate, and complete, and did not knowingly or recklessly disregard, misrepresent, or conceal material facts.

141.   Because of their reliance on these misrepresentations, and the omissions that Defendants made negligently (at least), Publix and the Plan were damaged.

142.   Thus, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

## COUNT FIVE BY BOTH PLAINTIFFS
## UNJUST ENRICHMENT

143.   Plaintiffs incorporate by reference as fully set forth herein the factual allegations set forth above in paragraphs 1 through 87, each of which is applicable to the cause of action set forth in this Count Five.

144.   The ABA Centers are liable under the principle of unjust enrichment.

145.   The ABA Centers used wrongful conduct to obtain a benefit to which it is not entitled.

146.   The ABA Centers knowingly submitted false and fraudulent information to Plaintiffs and their claims administrator that induced payments by Plaintiffs that they would not have made but for the wrongful conduct of ABA Centers as described herein.

147.   When Plaintiffs made payments as a result of the false and fraudulent information submitted by ABA Centers, ABA Centers received a benefit from Publix and the Plan.

148.   As a result, ABA Centers have been unjustly enriched and Publix and the Plan have been injured.

149.   It would be inequitable for ABA Centers to retain amounts they received from payments made by Publix and the Plan that were induced by ABA Centers' wrongful conduct alleged herein.

150.   Plaintiffs lack an adequate remedy at law for all of the injuries inflicted by ABA Centers, and accordingly seek the return of that money in equity to compensate them.

## COUNT SIX BY BOTH PLAINTIFFS
## VIOLATION OF FLORIDA DECEPTIVE
## AND UNFAIR TRADE PRACTICES ACT

151.    Plaintiffs incorporate by reference as fully set forth herein the factual allegations set forth above in paragraphs 1 through 87, each of which is applicable to the cause of action set forth in this Count Six.

152.    The ABA Centers are, and have been, engaged in trade and commerce in the State of Florida.

153.    The ABA Centers has sought to specifically harm Florida consumers in the execution of their deceptive and fraudulent scheme.

154.    Publix and the Plan are consumers under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). *See* Fla. Stat. § 501.203(7).

155.    Publix and the Plan have been injured and suffered actual damages by making payments caused by ABA Centers' unfair or deceptive practices in connection with the fraudulent out-of-network provider circumvention scheme described herein, which was carried out in the State of Florida.

156.    The ABA Centers' business practices constitute both *per se* and traditional violations of FDUTPA.

157.    The ABA Centers' acts and practices described above, including its submission of fraudulent and improper claims and billings for claims to Plaintiffs constitute *per se* FDUTPA violations because they violate statutes that proscribe unfair methods of competition and unfair, deceptive, or unconscionable acts or practices, including Fla. Stat. § 817.234 (prohibiting false and fraudulent insurance claims).

158.   The ABA Centers' unlawful acts and practices affected many claims for services rendered in Florida and have caused significant economic harm and actual damages to Publix and the Plan, and caused Publix and the Plan to make substantial payments, to the benefit of ABA Centers, that they were not obligated to make.

159.   The ABA Centers' acts and practices also constitute traditional violations of FDUTPA.

160.   The ABA Centers' unfair trade practices and deceptive acts that comprised their out-of-network provider circumvention scheme described herein misled Publix and the Plan and caused them to make substantial payments for the benefit of ABA Centers that were not owed and would not have been paid but for ABA Centers' conduct.

161.   As a result, ABA Centers have committed deceptive acts likely to mislead Plaintiffs acting reasonably under the circumstances.

162.   Plaintiffs seek actual damages for benefits paid on the unlawful and deceptive claims submitted, or caused to be submitted, by ABA Centers to Publix or its claims administrator, plus its attorney's fees, costs, and interest; a declaratory judgment declaring the ABA Centers' acts and practices unfair and deceptive and in violation of FDUTPA.

163.   Publix and the Plan additionally seek an order enjoining the ABA Centers from continuing to engage in unfair and deceptive acts and practices; and any other relief the Court deems just and proper.

164.    By virtue of the foregoing, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

### COUNT SEVEN BY PUBLIX
### APPROPRIATE EQUITABLE AND DECLARATORY  RELIEF UNDER ERISA § 502(a)(3) AND 29 U.S.C. §1132(a)(3)

165.    Publix, in its capacity as administrator of the Plan, incorporates by reference as fully set forth herein the factual allegations set forth above in paragraphs 1 through 87, each of which is applicable to the cause of action set forth in this Count Seven.

166.    Publix offers its health benefit plan, the Plan, for certain health services governed by ERISA.

167.    Publix and the Plan have an agreement with their claims administrator covering the rights and obligations of Publix, the administrator and the Plan.

168.    The agreement and/or plan documents delegates to Publix, the Plan, and the administrator the authority to interpret the benefit plans and determine claims for benefits.

169.    The administrative services agreements and/or plan documents also give Publix, the Plan, and the administrator discretion and authority to monitor and pursue overpayment of funds from the Plan, including overpayments resulting from fraud, waste or abuse through litigation.

170.    Publix has standing under ERISA § 502(a)(3) and 29 U.S.C. § 1132(a)(3) to seek appropriate equitable and declaratory relief to enjoin any acts or practices that violate the provisions of the Plan and to obtain other appropriate relief to redress

violations of and enforce benefit plan terms.  Publix can also seek declaratory relief under 28 U.S.C. § 2201 and § 2202.

171.   The Plan is not required to pay for fraudulent claims.

172.   As described above, including through improper, inaccurate and fraudulent billed charges submissions and the rest of the out-of-network provider circumvention scheme, ABA Centers caused the overpayment of funds on behalf of the ERISA-governed benefit Plan in violation of the Plan's terms and Publix is authorized to recover such overpayments and to put a stop to continued efforts to defraud and obtain overpayments from the Plan.

173.   Based on information and belief, ABA Centers continues to engage in a pattern of fraudulent and tortious activity presently, including by engaging in the out-of-network provider circumvention scheme described herein, including overbilling for excessively-priced claims and submitted false and fraudulent inflated billed charges information.

174.   The claims in Exhibits A-1, A-2, B-1 and B-2 are fraudulent and/or contain material misrepresentations from ABA Centers, and in violation of the Plan's terms.

175.   There is an actual case and controversy between Publix and the Plan (on the one hand), and ABA Centers (on the other hand) relating to the claims fraudulently submitted and paid for by funds set aside by Publix as administrator of the Plan.

176. Accordingly, Publix seeks appropriate equitable relief, including but not limited to, injunctive relief, disgorgement, restitution in equity and all other relief to which Publix is entitled, including an Order:

a. Enjoining ABA Centers from any improper billing practices; and

b. Enjoining ABA Centers from transferring or dissipating funds paid by Publix on behalf of the Plan.

177. There is no other remedy available at law to prevent the irreparable harm that will result as to Publix if the ABA Centers are permitted to continue engaging in the conduct described herein, and thus Publix is entitled to appropriate equitable relief.

## COUNT EIGHT BY BOTH PLAINTIFFS
## DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201 AND § 2202

178. Plaintiffs incorporate by reference as fully set forth herein the factual allegations set forth above in paragraphs 1 through 87, each of which is applicable to the cause of action set forth in this Count Eight.

179. There is an actual, substantial, and present controversy between Publix and the Plan, on the one hand, and ABA Centers, on the other hand, concerning the propriety of and amounts paid previously in connection with the claims set forth on Exhibit A-1 and Exhibit A-2.

180. There is an actual, substantial, and present controversy between Publix and the Plan on the one hand, and ABA Centers, on the other hand, concerning the propriety of and whether Plaintiffs have any liability in connection with, or are justified in not paying, the claims set forth on Exhibit B-1 and Exhibit B-2. As described above,

Plaintiffs believe these claims are based on false and fraudulent billed charges information submitted by ABA Centers, and which information contained material misrepresentations and omissions in violation of the Plan terms.

181. ABA Centers are continuing to submit such false and fraudulent billed charges information to Plaintiffs and their claims administrator.

182. Further, from 2022 to present, ABA Centers submitted such false and fraudulent billed charges information to Plaintiffs and their claims administrator and induced Plaintiffs to pay at least $5.8 million based on those fraudulent submissions.

183. Thus, there is a controversy as to Publix/the Plan's obligation to pay for claims billed by ABA Centers pursuant to their improper billing scheme, as described above, both retroactively and prospectively.

184. Publix, the Plan and ABA Centers have adverse legal interests.

185. ABA Centers have asserted that they are entitled to payments from the Plan for certain services rendered to Plan Participants from 2022 to present.

186. Publix and the Plan maintain that they have been defrauded into making significant payments for the benefit of ABA Centers from 2022 to October 2024, during which time ABA Centers was engaging in the out-of-network provider circumvention scheme described herein.

187. Publix and the Plan further maintain that this scheme continues and that Plaintiffs are not obligated to make any payment in connection with those claims which are on Exhibit B-1 and Exhibit B-2.

188.   There is a present need for a declaration as to the unlawfulness of the ABA Centers' conduct as the ABA Centers continue to submit false and fraudulent billed charges information to Plaintiffs and the claims administrator seeking to induce payments under the Plan.

189.   Accordingly, Plaintiffs seek a declaration and judgment that (a) the false and fraudulent billed charges submissions from ABA Centers containing the material misrepresentations and omissions described herein do not result in any payment obligation by Plaintiffs under the ERISA Plan on a past, present or future basis; and (b) ABA Centers has received overpayments made by Plaintiffs that were the result of false and fraudulent billing charge information submitted by ABA Centers, which overpayments Plaintiffs are entitled to recoup.

**COUNT NINE BY BOTH PLAINTIFFS**
**TORTIOUS INTERFERENCE WITH CONTRACT**

190.   Plaintiffs incorporate by reference as fully set forth herein the factual allegations set forth above in paragraphs 1 through 87, each of which is applicable to the cause of action set forth in this Count Nine.

191.   The ABA Centers' conduct, specifically their fraudulent out-of-network provider circumvention scheme described herein, gives rise to a claim for tortious interference with contract.

192.   Publix, as the Plan sponsor and administrator, and the Plan, have a contractual relationship with Plan Members.

193.    More specifically, the Plan functions in accordance with the terms of the contracts and/or plan documents, which establish, among other things, the rights and responsibilities of the payor (Publix/Plan), of any claims administrator, and of the Plan Participants (i.e., Publix associates and their covered dependents/beneficiaries).

194.    The Plan creates an advantageous business relationship between Plaintiffs and Plan Members and sets forth the legal rights for Publix and the Plan Members as it relates to benefits provided in connection therewith.

195.    ABA Centers know there is a contract between Plaintiffs and Plan Members.  ABA Centers know that terms of that contract establish requirements for coverage of benefits from providers, including out-of-network providers like them.

196.    ABA Centers knows whether the individuals to which they provide services are Plan Participants.  If they are Plan Participants, ABA Centers knows that the contract requires the member to pay deductible, co-insurance or other cost-share obligations for their out-of-network services as a condition of coverage. ABA Centers also know those cost-sharing measures are critical components of the contract and designed to ensure cost effective and efficient use of health care services and Plan resources for the benefit of all Plan Members who make contributions similar to premiums to participate in and receive coverage under the Plan.  By virtue of the out-of-network provider circumvention scheme described herein, ABA Centers not only knows these things, but deliberately intends to cause the Plan Members not to follow the contract by refusing to request or, in fact, collect those cost sharing payments and otherwise encouraging the Members to pay far

less than is required of them under the Plan contract or otherwise nothing at all in violation of the terms of the Plan (i.e., contract).

197.  The conduct is wrongful because it constitutes fraud and is undertaken to enrich ABA Centers with monies it is not legally entitled to.

198.  For the relevant time period (since 2022), the Plan's terms and conditions applicable to out-of-network services provided by the ABA Centers to Plan Members or their beneficiaries calculate the Plan's liability to Plan Members based upon the ABA Centers reported billed charge.  When ABA Centers misrepresented (i.e., overstated or inflated) their billed charge in submissions to the Plan or its administrator, BCBS, the Plan, in reliance on that reported retail price, was misled into paying the wrong amount, and an amount different from (and higher than) its actual liability to the Plan Member under the terms of the Plan.

199.  When the ABA Centers, as an out-of-network provider under the Plan, reports its billed charge in submissions to the Plan, it does so knowing it has no right to receive payment directly from the Plan, that the Plan will not make payment directly to the ABA Centers, and that the Plan will only make payment directly to the Plan Member. The ABA Centers also know, expect, and intend that the Plan will calculate the Plan's and Plan Member's responsibility for the cost of the ABA Centers' services by relying on the ABA Centers' reported billed charge and the understanding that the ABA Centers will collect their full billed charge from the Plan Member.

200.  Understanding the basic structure of PPO plans, each of the ABA Centers employed the out-of-network provider circumvention scheme to defeat the Plan's terms

and realign the economic incentives in a way that harmed Plaintiffs and enriched ABA Centers. In this way, the ABA Centers make Plan Members indifferent to the price, including increases in price, for the ABA Centers' services, and the full cost of their services is ultimately borne entirely by the Plan.

201. Accordingly, the ABA Centers maliciously, wrongfully, and knowingly interfered with the contractual relationship between Plaintiffs and Plan Members under the Plan.

202. ABA Centers' tortious interference has caused damages to Publix as explained herein.

## JURY DEMAND

Plaintiffs request a jury trial as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request an award in their favor granting the following relief:

a.     An award of compensatory damages as requested herein;

b.     Treble damages under RICO;

c.     An award of punitive and exemplary damages;

c.     Equitable and declaratory relief as requested herein;

d.     Costs;

e.     Reasonable attorney fees, including under RICO;

f.     Prejudgment and post-judgment interest; and

g.      An award of any other relief in law or equity that the Court deems

just and proper.

Dated: September 11, 2025                    Respectfully submitted,

                                             *s/Anne Marie Estevez*
                                             Anne Marie Estevez
                                             Florida Bar No. 991694
                                             aestevez@morganlewis.com
                                             Clay M. Carlton
                                             Florida Bar No. 85767
                                             clay.carlton@morganlewis.com
                                             MORGAN, LEWIS & BOCKIUS LLP
                                             600 Brickell Avenue, Suite 1600
                                             Miami, FL 33131
                                             Telephone: 305.415.3000
                                             Facsimile: 305.415.3001

                                             Brian W. Shaffer (pro hac vice to be filed)
                                             brian.shaffer@morganlewis.com
                                             MORGAN, LEWIS & BOCKIUS LLP
                                             2222 Market Street
                                             Philadelphia, PA  19103
                                             Telephone: 215.963.5000
                                             Facsimile: 215.963.5001

                                             Kelly A. Moore (pro hac vice to be filed)
                                             kelly.moore@morganlewis.com
                                             MORGAN, LEWIS & BOCKIUS LLP
                                             101 Park Avenue
                                             New York, NY 10178
                                             Telephone: 212.309.6000
                                             Facsimile:  212.309.6001