# EXHIBIT A

# IN THE CIRCUIT COURT OF THE 17th JUDICIAL CIRCUIT
# IN AND FOR BROWARD COUNTY, FLORIDA

ABA CARES OF FLORIDA, LLC,            CASE NO.:
d/b/a ABA CENTERS OF FLORIDA,
a Florida corporation, (o/b/o Jane and
John Doe Members #1-10)

    vs.

PUBLIX SUPERMARKETS, INC.,
a Florida corporation,

_____/

## COMPLAINT

COMES NOW, Plaintiff, ABA CARES OF FLORIDA, LLC d/b/a ABA CENTERS OF FLORIDA (hereinafter, "ABAFL"), o/b/o Jane and John Does Members #1-10 (hereafter "Members") (Members and ABAFL are collectively referred to as "Plaintiff") hereby sues Defendant, PUBLIX SUPERMARKETS, INC. (hereinafter, "Publix" or "Defendant"), and alleges as follows:

## NATURE OF THE CASE

1. This action is brought on behalf of ABAFL, which provides care and treatment to Florida residents who are beneficiaries of insurance policies issued and administered by Defendants.

2. ABAFL provides care and treatment to children diagnosed with autism spectrum disorder (ASD). Applied Behavior Analysis (ABA) therapy is a medically necessary service and recognized as the standard of care for children with ASD.

3. ABAFL has provided ABA therapy to ten (10) children residing in Broward County, Palm Beach County, Orange County, Pasco County, and Martin County who are beneficiaries of insurance policies issued and administered by Defendants (collectively, the "Members").

4. Even though ABA therapy and treatment is medically necessary, and services rendered were *covered, authorized, and partially paid* by Defendant, it is now improperly refusing full payment for such care and treatment, thereby threatening the health, life and safety of its beneficiaries.

5. At all times relevant, ABAFL performed its responsibilities under the agreement. However, after ABAFL rendered services, Defendants repudiated and breached the agreement, depriving ABAFL of its entitlement to reimbursement.

## PARTIES, JURISDICTION, AND VENUE

6. This is a civil action for damages to recover underpaid healthcare claims pursuant to Florida Statute §§ 627.6131 and 627.6686 and for other relief requested exceeding $50,000.00, exclusive of court costs, pre-judgment interest, and attorney fees.

7. ABAFL is a Florida for-profit corporation with its principal place of business in Broward County, Florida.

8. Defendant Publix is a Florida for profit-corporation with its principal place of business in Polk County, Florida. Publix operates supermarkets and in furtherance of its operations, employs workers and makes available employee benefit plans to persons or risks located within the state of Florida, including Broward County, Florida.

9. All amounts due and owing were to be paid in Broward County, Florida.

10. Venue is proper in Broward County, Florida, as a substantial part of the events or omissions giving rise to the claim occurred in Broward County, Florida.

11. At all times material hereto, Publix, is and was a self-funded employer that sponsored a health insurance plan of which certain ABAFL patients are and were beneficiaries.

12. Member # 1 ("Member 1") is a fictional alias[1] for a patient who received the medical services described in this Complaint. Upon information and belief, Member 1 can be identified by Publix utilizing their three-character alpha prefix (PXN) and the last 5 digits of their Member ID number (*72662).

13. Member # 2 ("Member 2") is a fictional alias for a patient who received the medical services described in this Complaint. Upon information and belief, Member 2 can be identified by Publix utilizing their three-character alpha prefix (PXN) and the last 5 digits of their Member ID number (*37458).

14. Member # 3 ("Member 3") is a fictional alias for a patient who received the medical services described in this Complaint. Upon information and belief, Member 3 can be identified by Publix utilizing their three-character alpha prefix (PXN) and the last 5 digits of their Member ID number (*54123).

15. Member # 4 ("Member 4") is a fictional alias for a patient who received the medical services described in this Complaint. Upon information and belief, Member 4 can be identified by Publix utilizing their three-character alpha prefix (PXN) and the last 5 digits of their Member ID number (*13140).

16. Member # 5 ("Member 5") is a fictional alias for a patient who received the medical services described in this Complaint. Upon information and belief, Member 5 can be identified by Publix utilizing their three-character alpha prefix (PXN) and the last 5 digits of their Member ID number (*13140). Member 4 and Member 5 are siblings.

17. Member # 6 ("Member 6") is a fictional alias for a patient who received the medical services described in this Complaint. Upon information and belief, Member 6 can be identified by

---

[1] Although ABAFL has appropriate consent to pursue this action, fictional aliases are used for all patients herein, who are children, to ensure privacy under state and federal law.

Publix utilizing their three-character alpha prefix (PXN) and the last 5 digits of their Member ID number (*64007).

18. Member # 7 ("Member 7") is a fictional alias for a patient who received the medical services described in this Complaint. Upon information and belief, Member 7 can be identified by Publix utilizing their three-character alpha prefix (PXN) and the last 5 digits of their Member ID number (*08265).

19. Member # 8 ("Member 8") is a fictional alias for a patient who received the medical services described in this Complaint. Upon information and belief, Member 8 can be identified by Publix utilizing their three-character alpha prefix (PXN) and the last 5 digits of their Member ID number (*08265). Member 7 and Member 8 are siblings.

20. Member # 9 ("Member 9") is a fictional alias for a patient who received the medical services described in this Complaint. Upon information and belief, Member 8 can be identified by Publix utilizing their three-character alpha prefix (PXN) and the last 5 digits of their Member ID number (*28602).

21. Member # 10 ("Member 10") is a fictional alias for a patient who received the medical services described in this Complaint. Upon information and belief, Member 10 can be identified by Publix utilizing their three-character alpha prefix (PXN) and the last 5 digits of their Member ID number (*01949).

22. Upon information and belief, Blue Cross and Blue Shield of Florida (hereinafter "BCBSFL") (not a party to this suit) is and was a health insurance company initially responsible for providing plan and claims administration services to Publix for the benefit of its Members, including Plaintiff's patients.

23. Upon information and belief, Blue Cross and Blue Shield of Florida later retained, or assigned its duties and responsibilities to, Blue Cross and Blue Shield of South Carolina (hereinafter "BCBSSC") (also not a party to this suit) to provide plan and claims administration services to Publix for the benefit of its Members, including Plaintiff's patients.

24. Upon information and belief, BCBSFL and/or BCBSSC were granted discretionary authority to interpret and apply plan terms and to make payment recommendations to Publix in connection with its review of claims under the plan.

25. Upon information and belief, Publix, as plan administrator, retained the ultimate responsibility for handling, adjudicating and paying claims.

26. Under the terms of the plan administered by Publix, covered individuals are entitled to payment for medically necessary health benefits.

27. Under the terms of the plan administered by Publix, covered services provided by a non-participating provider are to be reimbursed at an agreed upon amount, or the usual and customary rates for the community or geographic area based on what providers in the area usually charge for the same or similar medical services.

28. All conditions precedent to the institution of this action have occurred, been performed, been waived, or were futile.

## BACKGROUND ALLEGATIONS

### Autism Spectrum Disorder

29. ASD affects social skills, communication, and behaviors. Children with ASD present uniquely across a wide spectrum. The Centers for Disease Control and Prevention (CDC) reports that 1 in 31 children are diagnosed with ASD, and early therapeutic intervention is critical.

30. Research has revealed that children with ASD are 2.3 times more likely to require

emergency department visits, a burden that is significantly reduced when care is accessed promptly.

31. Elopement, or wandering, is a common behavior among individuals with ASD. Elopement occurs when a child with ASD leaves a safe space or caregiver without permission or supervision. Elopement is a serious and life-threatening issue for children with ASD, with nearly 50% having attempted or successfully eloped. Drowning due to elopement is the leading cause of death for children with ASD accounting for 91% of fatalities. Children with ASD are more likely to drown than their neurotypical peers, with most drownings occurring in their own backyards.

32. These tragedies are preventable with timely access to ABA therapy, which helps develop self-control and reduce elopement behaviors. For a child with ASD who elopes, being placed on a waitlist gives rise to grave risk of harm.

### Applied Behavior Analysis Therapy

33. Applied Behavior Analysis (ABA) is the standard of care for children with ASD. ABA is a therapy based on the science of learning and behavior. ABA therapy delves deeply into the ways that individuals learn and behave, then uses that understanding to enable them to develop new abilities and work on challenges. It is typically used to help children with ASD and other developmental disorders learn behaviors that help them live safer and more fulfilling lives.

34. ABA therapy focuses on improving a child's skills in a multitude of facets, including communication and language abilities, social interactions, self-care and hygiene routines, play and leisure, and motor abilities. ABA is often used to help children with ASD cope with harmful or dangerous behaviors.

35. ABA therapy usually begins by identifying unsafe behavior, learning about what causes

the behavior and then teaching a safer alternative response.

36. An ABA therapy plan is designed by a qualified Board-Certified Behavior Analyst (BCBA) who evaluates the child's unique needs, skills, preferences, interests, challenges and family situation. The BCBA uses this information to create goals and an intervention plan. This plan is then delivered by a trained clinician, such as a registered behavior technician (RBT) or board-certified assistant behavior analyst (BCABA).

37. The main purpose of ABA therapy is to improve the child's abilities in ways that are meaningful to their overall quality of life.

38. ABA therapy treatment plans are individualized and based upon the unique clinical needs of a child diagnosed with ASD. Specific treatment plans can range from a few hours a week to 40 hours a week.

39. Research shows that starting ABA therapy early, ideally as soon as signs of ASD emerge, leads to measurable improvements in learning, communication, and social skills, laying the foundation for better long-term outcomes.

40. Timely access to ABA therapy is crucial and any delays can be detrimental. Studies show that children who are placed on waitlists are at higher risk of developmental regression, losing critical windows of opportunity for progress.

41. Furthermore, children who receive ABA intervention before the age of five are more likely to integrate into typical classroom settings and succeed academically.

42. Long-term ABA therapy has also been shown to result in significant improvement in intellectual function, drastically enhancing the child's developmental trajectory.

43. Thus, ABA therapy is medically necessary for children diagnosed with ASD.

44. However, across the country, children diagnosed with ASD are placed on waitlists for

several months to years before they are able to receive the medically necessary ABA therapy that is the standard of care for children with ASD.

45. A survey from the Autism Society of America shows that children who are placed on waitlists are at higher risk of developmental regression, losing critical windows of opportunity for progress. For a child with ASD who elopes, being placed on a waitlist gives rise to grave risk.

46. Children with ASD need and deserve immediate access to ABA therapy. Any delay in providing children with ASD the access to ABA therapy is a departure from the standard of care that results in harm to children with ASD.

### Plaintiff provides quality, medically necessary and covered clinical care

47. ABAFL is committed to eliminating the waitlist barrier, offering immediate access to high-quality ABA therapy. While the waitlist for ABA services for many providers can be months or years, depending on location and provider, Plaintiff offers immediate availability to accept new clients into care in most markets in which it currently operates. This ensures that children with ASD receive the medically necessary, evidence-based intervention that is crucial without delay.

48. ABAFL is dedicated to rendering the best care possible in the industry for all patients. ABAFL's commitment to clinical excellence includes ABA training programs to promote registered behavior technicians (RBTs), crisis prevention training, hands on training under experienced board-certified behavior analysts (BCBAs), coordination with special interest groups for collaboration and professional development, peer mentor programs and collaborative case reviews.

49. ABAFL strives to maintain lower clinician to patient ratios than the average ABA provider. ABAFL offers Defendants' members access to services that are unlike any other available from most in-network ABA providers and must be compensated accordingly.

50. Further, Plaintiff provided these services consistent with Florida law, which requires Defendants to provide benefits for "Treatment of autism spectrum disorder and Down syndrome through speech therapy, occupational therapy, physical therapy, and applied behavior analysis." *See* Fla. Stat. § 627.6683(3)(b).

## The Covered Services

51. At all material times, Members #1-10 were covered by the health insurance plan sponsored by Publix.

52. Upon information and belief, BCBSFL was claims administrator for Publix. BCBSFL later retained or assigned its duties as a primary provider of claims processing to BCBSSC although BCBSFL may utilize the services of BCBSSC to administer certain portions of the plan.

53. Upon information and belief, BCBSFL, or BCBSSC had authority to authorize medically necessary care, yet Publix retained ultimate authority to adjudicate and pay claims.

54. At all material times, ABAFL had no direct agreement with Publix, BCBSFL, or BCBSSC to be reimbursed for its services provided to Publix's Members at discounted rates. Accordingly, ABAFL was and is considered an out-of-network or non-participating provider.

55. Nonetheless, as a direct result of ABAFL's utilization review efforts, it was able to assist the following patients in securing authorization(s) from BCBSFL and/or BCBSSC to utilize their out-of-network benefits to pay for services rendered by ABAFL:

    a. Member 1, a 6-year-old girl who was diagnosed with autism on or about January 25, 2024, and has been receiving treatment from ABAFL in Orange County, FL since approximately April 22, 2024.

b. Member 2, a 7-year-old boy, who was diagnosed with autism on or about December 8, 2023, and received treatment from ABAFL in Pasco County, FL until approximately February 13, 2023.

c. Member 3, a 4-year-old girl, who was diagnosed with autism on or about December 6, 2023, and has been receiving treatment from ABAFL in Palm Beach County, FL since approximately January 26, 2024.

d. Member 4, a 15-year-old girl, who was diagnosed with autism on or about September 25, 2023, and received treatment from ABAFL in Martin County, FL until approximately November 1, 2023.

e. Member 5, a 17-year-old girl, who was diagnosed with autism on or about September 25, 2023, and received treatment from ABAFL in Martin County, FL until approximately November 1, 2023.

f. Member 6, a 9-year-old boy, who was diagnosed with autism on or about April 19, 2024, and has been receiving treatment from ABAFL in Orange County, FL since approximately June 4, 2024.

g. Member 7, an 8-year-old boy, who was diagnosed with autism on or about January 30, 2023, and has been receiving treatment from ABAFL in Broward County, FL since approximately March 18, 2023.

h. Member 8, a 6-year-old boy, who was diagnosed with autism on or about October 28, 2022, and has been receiving treatment from ABAFL in Broward County, FL since approximately February 20, 2023.

   i. Member 9, a 5-year-old girl, who was diagnosed with autism on or about March 26, 2024, and has been receiving treatment from ABAFL in Orange County, FL since approximately April 9, 2024.

   j. Member 10, a 5-year-old boy, who was diagnosed with autism on or about January 31, 2024, and has been receiving treatment from ABAFL in Broward County, FL since approximately March 11, 2024.

56. Each of the Members identified above executed a valid written assignment of benefits assigning to ABAFL certain benefits payable pursuant to their policies and authorizing direct payment to Plaintiff of any insurance benefits otherwise payable to or on their behalf.

57. ABAFL timely and properly submitted its claims to BCBSFL and/or BCBSSC in the usual course of business for reimbursement and pursuant to relevant pre-authorizations.

58. ABAFL billed charges for its medical services for each of the patients above were within the usual and customary rates for the community or geographic area based on what providers in the area usually charge for the same or similar medical services.

59. Accordingly, Plaintiff is entitled to reimbursement of the billed charges, as that rate is within the usual and customary rates for the community or geographic area.

60. In the alternative, if Plaintiff's billed charges are determined to be in excess of the usual and customary rates for the community or geographic area, Plaintiff is entitled to reimbursement consistent with the usual and customary rates for the community or geographic area pursuant to each patient's respective out-of-network authorization.

61. Defendants have wrongfully refused to pay Plaintiff the entire amount of Plaintiff's billed charges on the submitted claims.

62. Defendants, by paying an arbitrary amount, has wrongfully refused to pay Plaintiff the usual and customary rates for the submitted claims.

63. By issuing payment to Plaintiff for the services performed by ABAFL, Defendant has approved each assignment pursuant to the terms of each Policy.

64. Plaintiff is entitled to interest thereon at a rate of 12% per annum on the amounts overdue on the underpaid claims pursuant to Florida Statutes § 627.6131(7).

**Plaintiff's Claims do not implicate Section 502(a) of ERISA**

65. To the extent that the Policy is governed by an Employee Retirement Income Security Act of 1974 ("ERISA") plan, Plaintiff's claims against Publix are solely for breach of the pre-authorization.

66. Plaintiff's claims concern only the *rate* of payment, rather than *right* of payment claims. These claims are based on contractual principles that are outside the scope of section 502(a) of ERISA, and are not completely preempted by ERISA. *See Connecticut State Dental Ass'n v. Anthem Health Plans, Inc.,* 591 F.3d 1337, 1350 (11th Cir. 2009); *See also Hialeah Anesthesia Specialists, LLC v. Coventry Health Care of Florida, Inc.,* 258 F. Supp. 3d 1323, 1330 (S.D. Fla. 2017).

**COUNT I**
**BREACH OF CONTRACT**
**(Third-Party Beneficiary)**

67. Plaintiff re-adopts and re-alleges and incorporates by reference paragraphs 1-66 as is fully set forth herein.

68. At all times relevant, the Members, while patients of ABAFL, received covered medically necessary services from ABAFL under the terms of the Policy.

69. At all times relevant, the services provided by ABAFL were performed pursuant to pre-authorizations received from Publix, by and through BCBSFL and/or BCBSSC.

70. ABAFL is a third-party beneficiary to the Policy since Defendant is mandated to pay for such services pursuant to Florida law.

71. ABAFL is also a third-party beneficiary to the Policy since (i) Florida law recognizes that medical service providers are intended beneficiaries of insurance contracts; (ii) such contracts primarily and directly benefit medical providers such as Plaintiff pursuant to Florida Statutes incorporated within the insurance contracts by the statutory incorporation doctrine; and (iii) because the insurance contracts either mandated or allowed for payment directly to Plaintiff for the services that were provided to Member. Moreover, at all times material, Defendant has acted as though Plaintiff was and is a third-party beneficiary thereby waiving any anti-assignment and/or anti-third-party beneficiary clause(s) in its Policy.

72. The Policy between Defendant and its Member should be interpreted to provide that Defendant should pay ABAFL its billed charges or, in the alternative, the usual and customary rates for the medical services rendered, if it is determined that the billed charges exceed the usual and customary rates for the medical services rendered. Alternatively, the charges for services rendered by ABAFL are either set by statute or administrative regulation, which is incorporated into the contract through the principle of statutory incorporation.

73. Moreover, at all times material, Defendant has acted as though ABAFL was and is a third-party beneficiary thereby waiving any anti-assignment and/or anti-third-party beneficiary clause(s) in its Policy.

74. Further, Member executed a written assignment of benefits assigning to ABAFL certain benefits payable pursuant to the Policy and also authorizing direct payment to ABAFL of any

13

insurance benefits otherwise payable to or on behalf of Member. In addition, or alternatively, Member equitably assigned their benefits under the Policy to ABAFL.

75. The Members are enrolled in Defendant's Employee Benefit Plan and as such Member's policy is governed by Florida Statutes Chapter 627. As such, Sections 627.64194 and 627.6131 are statutorily incorporated into Defendant's and Member's Policy.

**WHEREFORE**, Plaintiff demands judgment against Defendant Publix for the unpaid balance of its full billed charges, as same are within the usual and customary rates, or in the alternative, if Plaintiff's billed charges are determined to be in excess of the usual and customary rates for the community or geographic area, Plaintiff demands judgment for the unpaid usual and customary rates for the community or geographic area for its emergency and nonemergency charges for the medical services rendered, together with pre-judgment interest pursuant to Florida Statute § 627.6131(7), reasonable attorney's fees and costs pursuant to Florida Statutes § 627.428, and such other relief as the Court deems just and proper.

**COUNT II**
**BREACH OF CONTRACT**
**(Assignee/Direct Payee of Member)**

76. Plaintiff re-adopts and re-alleges and incorporates by reference paragraphs 1-66 as is fully set forth herein.

77. Defendant issued the policies to the Members which provided for payment of medical expenses as set forth therein.

78. Each policy was in full force and effect on the date(s) of service when ABAFL provided covered medical services to Members.

79. Members executed a written assignment of benefits assigning to ABAFL certain benefits payable pursuant to each policy and authorizing direct payment to ABAFL of any benefits

otherwise payable to or on behalf of Members.

80. In addition, or alternatively, Members equitably assigned their benefits under each policy to ABAFL.

81. At all times material, Defendants approved and/or authorized ABAFL to render services and submit claims for reimbursement pursuant to Members' policies.

82. The medical services provided by ABAFL to Members, as described above, were medically necessary and were appropriate in cost.

83. The Defendants already determined that the medical services provided by ABAFL were covered, and distributed payment to Plaintiff on certain claims pursuant to each policy. Plaintiff is simply seeking complete reimbursement for the provided services.

84. Defendant has unilaterally reduced or denied the medical bills that were submitted by Plaintiff for the services rendered to Members described above.

85. As a result, Defendants are in breach of its policies with Members.

86. As a direct and proximate result of such breach of the policies, Plaintiff has suffered damages.

87. Plaintiff is entitled to monetary damages and/or restitution from Defendant. In particular, and not by way of limitation, Defendant Publix is liable to Plaintiff for unpaid benefits, interests, attorneys' fees, and other penalties as this Court deems just and proper.

**WHEREFORE**, Plaintiff demands judgment against Defendant Publix for the unpaid balance of its full billed charges, as same are within the usual and customary rates, or in the alternative, if Plaintiff's billed charges are determined to be in excess of the usual and customary rates for the community or geographic area, Plaintiff demands judgment for the unpaid usual and customary rates for the community or geographic area for its emergency and nonemergency

charges for the medical services rendered, together with pre-judgment interest pursuant to Florida Statute § 627.6131(7), reasonable attorney's fees and costs pursuant to Florida Statutes § 627.428, and such other relief as the Court deems just and proper.

## COUNT III
## UNJUST ENRICHMENT

88. Plaintiff re-adopts and re-alleges and incorporates by reference paragraphs 1-66 as is fully set forth herein.

89. ABAFL was not contracted with Publix, BCBSFL, or BCBSSC on the day(s) that the medically necessary services were provided to the Members.

90. Plaintiff has properly and timely submitted claims for charges with the Defendant for the medical services that the Plaintiff provided to the Members.

91. Such charges were within the usual and customary rates for similar services in the community where such services were provided.

92. Despite demands, Defendant has refused and continues to refuse to pay the usual and customary rates but instead paid either well below usual and customary rates or nothing for the services provided.

93. The services provided by ABAFL were medically necessary in the care and treatment of the Members and were performed with the Defendant's knowledge. The care rendered by ABAFL was either properly authorized or required no such authorization for the specific medical services rendered. Authorization issued by the Defendant, BCBSFL, or BCBSSC encompasses medically necessary ancillary services ordered in the course of the treating clinician's treatment plan.

94. Thus, the services conferred a direct benefit to the Defendant and were accepted by the Defendant through the Members.

95. The circumstances indicate that it would be inequitable for the Defendant to be permitted to collect premiums from the Members and subscribers in return for agreeing to properly reimburse providers that render covered medical services without paying the value thereof to the provider. See *S. Broward Hosp. Dist. v. ELAP Services*, LLC, 20-CV-61007, 2020 WL 7074645, at *7 (S.D. Fla. Dec. 3, 2020); See also *Surgery Ctr. of Viera, LLC v. United Healthcare, Inc.*, 465 F. Supp. 3d 1211 (M.D. Fla. 2020).

96. Further, the Defendant retained the benefit that was conferred the Members without issuing usual and customary payment for the benefit.

97. As a result, the circumstances are such that the Defendant should, in all fairness, be required to pay for the services provided by ABAFL to the Members.

98. Due to Defendant's failure to pay the usual and customary rates for these medical services, Defendant has been unjustly enriched, and Plaintiff has suffered damages in the amount of the unpaid balance for its billed charges which are within the usual and customary rates for the medical services provided or, in the alternative, what is determined to be the usual and customary rates for the medical services provided, together with prejudgment interest and its reasonable attorney fees pursuant to §§ 627.428 and 627.6131(7), Florida Statutes.

**WHEREFORE**, Plaintiff demands judgment against Defendant Publix for the unpaid balance of its full billed charges, as same are within the usual and customary rates, or in the alternative, if Plaintiff's billed charges are determined to be in excess of the usual and customary rates for the community or geographic area, Plaintiff demands judgment for the unpaid usual and customary rates for the community or geographic area for its emergency and nonemergency charges for the medical services rendered, together with pre-judgment interest pursuant to Florida Statute §

627.6131(7), reasonable attorney's fees and costs pursuant to Florida Statutes § 627.428, and such other relief as the Court deems just and proper.

## COUNT IV
## PROMISSORY ESTOPPEL

99. Plaintiff re-adopts and re-alleges and incorporates by reference paragraphs 1-66 as is fully set forth herein.

100. At all times relevant, the services provided by ABAFL were performed pursuant to pre-authorizations received from Publix, by and through BCBSFL and/or BCBSSC.

101. These authorizations constitute unambiguous definite and substantial written promises to Plaintiff that it would be paid for the services it rendered upon the Members.

102. Publix was in a position to fully perform, fulfill, and carry out the terms and conditions of these promises it made to Plaintiff, and it was foreseeable that these promises would induce ABAFL to provide services in reasonable reliance upon them.

103. Accordingly, Plaintiff, in reliance upon the promises made by Defendant was in fact induced to provide medical services and had a reasonable expectation to be properly reimbursed pursuant to the subject authorizations.

104. Injustice can be avoided only by enforcement of the promises made by the Defendant.

105. Due to Defendant's failure to pay the usual and customary rates for these medical services, Plaintiff has suffered damages in the amount of the unpaid balance for its billed charges which are within the usual and customary rates for the medical services provided or, in the alternative, what is determined to be the usual and customary rates for the medical services provided, together with prejudgment interest and its reasonable attorney fees pursuant to §§ 627.428 and 627.6131(7), Florida Statutes.

18

**WHEREFORE**, Plaintiff demands judgment against Defendant Publix for the unpaid balance of its full billed charges, as same are within the usual and customary rates, or in the alternative, if Plaintiff's billed charges are determined to be in excess of the usual and customary rates for the community or geographic area, Plaintiff demands judgment for the unpaid usual and customary rates for the community or geographic area for its emergency and nonemergency charges for the medical services rendered, together with pre-judgment interest pursuant to Florida Statute § 627.6131(7), reasonable attorney's fees and costs pursuant to Florida Statutes § 627.428, and such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable as a matter of right to a jury.

Dated this 25th day of August 2025.

Respectfully submitted,

ICBD HOLDINGS, LLC
110 E Broward Blvd, Suite 2400
Fort Lauderdale, FL 33301
Telephone: (561) 323-6579
Facsimile: (954) 640-4406
E-Mail: kjohnson@icbdholdings.com
slinder@icbdholdings.com

By: /s/ *Kristy Johnson*
Kristy M. Johnson
Florida Bar No. 144282
Sean B. Linder
Florida Bar No. 1002351
*Attorneys for Plaintiff*

19